648 F.2d 183
 Fed. Sec. L. Rep. P 97,980
Harry A. DOWER, Robert F. Hunsicker, and Harry A. Dower,
Trustees, and Donald K. Hager, Appellants,
v.
MOSSER INDUSTRIES, INC. and Ecolaire, Inc., Appellees.
 No. 80-1869.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 14, 1981.
Decided May 5, 1981.
As Amended May 21, 1981.
 
 Harry A. Dower, pro se.
 Dower, Yarema & Co., P. C., Allentown, Pa., for appellants.
 Brett A. Schlossberg (argued), Dechert, Price & Rhoads, Philadelphia, Pa., for appellees.
 Before WEIS and HIGGINBOTHAM, Circuit Judges and McCUNE, District Judge.*
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 In this appeal, minority stockholders challenge a corporate merger forcing them to accept the company's cash offer for their shares or the value established in a statutory appraisal proceeding. Rejecting plaintiffs' contentions that the company misrepresented the value of the stock and the purpose of the merger, the district court entered judgment for the defendants. We agree that the plaintiffs failed to establish a violation of either federal or state law and, accordingly, affirm.
 
 
 2
 The plaintiffs' complaint in the district court alleged violations of section 10(b) of the Securities Exchange Act of 1934 and also asserted pendent claims under Pennsylvania law. The court denied the motion for a preliminary injunction barring the merger which eliminated plaintiffs as minority stockholders, and after a bench trial, entered judgment for the defendants.[1]
 
 
 3
 In 1977 the plaintiffs held approximately 3% of the outstanding common stock of Mosser Industries, Inc., a Pennsylvania corporation, and approximately the same percentage of warrants convertible into equivalent numbers of common shares. All warrants were due to expire on December 31, 1977.[2] Another group of minority stockholders owned approximately 3% of the stock and the remainder, 93.10%, was held by Ecolaire, Inc., which also owned some 97% of the outstanding warrants.
 
 
 4
 In September 1977 Mosser's Board of Directors approved plans for a $6,300,000 expansion program. When Mosser approached a local bank for financing, the company was told that in order to obtain a loan, Ecolaire would have to guarantee all, or a significant portion, of the debt. At a meeting on November 10, 1977, Ecolaire's board decided that it would provide such guarantees only if it were sole owner of Mosser. Ecolaire reasoned that it need not share the benefits of expansion with minority stockholders who did not assume any risk in the financing arrangement. Ecolaire also saw the merger as a means of eliminating administrative and financial burdens incurred because of minority ownership.
 
 
 5
 A month later, Ecolaire's president presented a plan to the Mosser Board providing for the merger of Mosser and a shell corporation, NMI, Inc., a wholly owned subsidiary of Ecolaire. As a result of the plan, Ecolaire would acquire all of Mosser's stock, and the minority stockholders would receive $8 per share.
 
 
 6
 After its Board approved the proposal, Mosser sent its shareholders a notice dated December 8 setting a special meeting for January 4, 1978 to vote on the merger. Included in the mailing were copies of the plan and pertinent portions of the Pennsylvania Business Corporation Law setting out the rights of dissenting stockholders. An accompanying letter explained the reasons for the merger, details of the expansion proposal, the method used to determine the $8 per share price for the stock, and directions for exercising the stock purchase warrants.
 
 
 7
 While the merger was proceeding, Mosser also prepared to process the conversion of warrants due to expire on December 31, 1977. To assist the holders in deciding whether to exercise their warrants at a price of $4 per share, the company sent them a number of documents on November 3. These included financial statements for the previous three years. The package also contained an information statement with details of the company's history, products, markets, backlog of orders, executive salaries, plans for expansion, transactions with Ecolaire, book value of the stock, and pending antitrust litigation against the company by Damper Design, Inc., whose principal shareholder was plaintiff Hagar.
 
 
 8
 During the same period of time, plaintiff Dower, on behalf of himself and co-parties, asked for additional disclosures. He requested all the financial data given to Ecolaire and a five-year plan prepared by Mosser, which included projections of sales and profits. Moreover, Dower asked what new products the company intended to develop and what additional markets it planned to enter.
 
 
 9
 After the company refused Dower's request, he filed the present suit on December 27, 1977. The district court issued a temporary restraining order that delayed the Mosser shareholder meeting and provided that the warrants would not expire on December 31. After a hearing, the court denied plaintiffs' request for a preliminary injunction and permitted the shareholder meeting to be held on January 19, 1978, adding that the warrants could expire on the same day. Before that date, all warrantholders, including the plaintiffs, purchased stock at $4 per share.
 
 
 10
 Some of the minority stockholders, including the trustees who are plaintiffs in this case, elected to sell at $8 per share in the merger proceedings, but the individual plaintiffs did not. Mosser then filed an appraisal suit, which is still pending in the Court of Common Pleas of Lehigh County.
 
 
 11
 The district court concluded that the plaintiffs had stated claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), but that the evidence did not substantiate their contentions. Specifically, the court found the plaintiffs had failed to establish that the alleged omissions and misrepresentations would have been relevant to a reasonable investor's decision either to exercise the warrants or to approve the merger.
 
 
 12
 One alleged misrepresentation in the November disclosure statement was that no active market for Mosser stock existed and the only recent transaction was a sale by two company officers to Ecolaire at a price of $8 per share. Plaintiffs contended that this statement was false because, in addition to the $8 per share, the officers received "phantom stock units" in Ecolaire as part of the consideration. These phantom stock units, however, would acquire worth only if the book value of Ecolaire stock increased after receipt. The court found that the transfer was designed to furnish an incentive for two key executives to remain with Mosser and was not part of the sale price. Accordingly, the court concluded that there had been no misrepresentation.
 
 
 13
 Plaintiffs also maintained that the stated method of arriving at the book value of the stock was misleading because it did not disclose that the Mosser employee who made the calculations was not a securities analyst. The district court determined, however, that a reasonable shareholder would be interested in the method of valuation, rather than the identity of the analyst. Because the method of computing the price per share had been fully disclosed, the court found no misleading statement.
 
 
 14
 The allegations of material omissions were similarly unsuccessful. The court rejected, for example, the plaintiffs' argument that Ecolaire placed a far higher value on the Mosser stock than $8 per share. The basis for this contention is a series of computations prepared by the plaintiffs taking into account the amounts expended by Ecolaire in exercising warrants and purchasing minority shares. The district court determined that because the plaintiffs did not establish that the defendants had engaged in similar calculations, there was no omission from the disclosure statement. The court also observed that the plaintiffs' contention was inconsistent with the $8 per share price offered to Mosser executives earlier that year.
 
 
 15
 The $8 per share figure was the result of evaluating book value, as well as earnings, actual and anticipated, for 1977, and applying a price-earnings multiple based on the ratios of publicly traded shares of firms in similar businesses. Although the plaintiffs tendered other methods of calculating the value, which included the cost to Ecolaire of acquiring full control, the district court concluded that the disclosure of the method used by the company was adequate.
 
 
 16
 The plaintiffs also objected to the fact that after it became clear that they intended to litigate the matter, the company told other minority stockholders that if the plaintiffs succeeded in establishing a higher value than $8 for the stock, the increased price would be paid to all stockholders. The district court decided that the company's failure to communicate this commitment to the plaintiffs, whose activities would precipitate the increased figure, was not a violation of the 1934 Act.
 
 
 17
 The court also upheld Mosser's refusal to furnish Dower with the additional material he had requested. Although the information may have been useful to a particular litigant, for example, plaintiff Hagar who the court noted was a competitor of Mosser, the court determined that the data would not have been material to a reasonable investor. Moreover, the plaintiffs' reliance on the SEC's "safe harbor" rule, 17 C.F.R. § 230.175 (1980), which protects certain disclosures of forecast data, was found inapposite primarily because the rule provides only for voluntary disclosure.
 
 
 18
 Plaintiffs also complained that there had been no disclosure that the Envirotech Corporation had offered to purchase voting control of the E.J. Lavino & Co., the corporate parent of Ecolaire. Unimpressed by this contention, the court stated that an offer to purchase control of Mosser's twice removed corporate parent was immaterial.
 
 
 19
 Finally the district court considered plaintiffs' allegation that there was no valid business reason for the merger, but that it was simply a freeze out of the minority. Treating this contention as within § 10(b) as well as state law, the court found no violation since the primary reason for the merger was in fact the anticipated loan guarantee. Because financing for the company's expansion would come after the merger, the court concluded that the arrangement furthered a valid business purpose and was fundamentally fair.
 
 
 20
 Several other contentions by the plaintiffs were also considered and rejected by the district court. Ultimately finding no violation of § 10(b) or any fraud or unfairness under state law, the court entered judgment for the defendants.
 
 
 21
 On appeal, plaintiffs argue that most of the district court's "findings" are not factual determinations reviewable under the clearly erroneous standard of Fed.R.Civ.P. 52(a), but rather conclusions which are judged by a legal error guideline. The defendant responds with the Supreme Court's observation in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), that the "determination (of materiality) requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."[3]
 
 
 22
 Much of plaintiffs' brief is directed to disputing the conclusions of the district court that rest upon the inferences derived from the facts. The disagreement with respect to the price paid to the Mosser executives for their stock falls in this category.
 
 
 23
 The two Mosser officers offered their stock to Ecolaire in early 1977 at a price in excess of $11 per share, later reduced to $10 per share, and $7 per warrant. One of Ecolaire's vice presidents suggested offering a combination of cash and phantom Ecolaire stock units. Because the value of these units was based solely on a possible increase in the book value of Ecolaire stock, the phantom shares had only potential worth. Ecolaire's president, however, specifically disapproved this proposal and insisted upon a cash only purchase of the stock. The parties ultimately agreed upon a price of $8 per share and $4 per warrant. Recognizing, however, that the two Mosser executives were vital to the future of the company and that termination of their equity ownership might diminish their incentive to stay at Mosser, Ecolaire's president proposed that they be given phantom stock in an amount similar to that held by other Ecolaire officers.
 
 
 24
 Determining whether the cash purchase of stock and the transfer of phantom shares were two separate transactions or one depended upon an assessment of all the evidence, both oral and written, and not primarily on appraisal of two inter-office corporate memoranda as plaintiffs appear to argue. Under these circumstances, we are not disposed to overturn the trial court's findings that Mosser did not misrepresent the price paid for its stock, particularly since we find no inherent conflict between the written and oral evidence.[4] See Glick v. Campagna, 613 F.2d 31, 36 (3d Cir. 1979); Thomas v. Duralite Co., 524 F.2d 577, 585 (3d Cir. 1975).
 
 
 25
 Nor are we persuaded that the district court erred in determining that the omissions cited by the plaintiffs were not material. This court recently held that the Supreme Court's definition of materiality under Rule 14a-9 applies as well to Rule 10b-5: "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." Healey v. Catalyst Recovery of Pennsylvania, Inc., 616 F.2d 641, 647 (3d Cir. 1980), quoting TSC Industries, Inc. v. Northway, Inc., supra at 449, 96 S.Ct. at 2132.
 
 
 26
 Correctly applying this standard, the district court decided that many of the omissions alleged by the plaintiffs exceeded the scope of information that a reasonable investor would find significant. For example, a reasonable Mosser shareholder or warrantholder would not consider an offer made to stockholders of Ecolaire's corporate parent relevant to the merger proposal.
 
 
 27
 Additionally, the district judge expressed concern that since plaintiff Hagar was a competitor of Mosser, the information was not sought in good faith. Hagar contends, however, that the district court erred in finding that he was a competitor of Mosser at the time the merger took place although he concedes that may be true at the present time. He denies that Mosser's reluctance was based on his bad faith and reads the testimony as establishing that Mosser did not wish to furnish information to competitors generally, and not specifically to Hagar as the court interpreted the testimony.
 
 
 28
 The record, however, does establish that Hagar was an officer and the principal stockholder of Damper Design, a company manufacturing some of the same products as Mosser, that there was antitrust litigation between the two companies at the time of the merger, and that the relations between them were not amicable. Therefore, even if the plaintiffs are correct in their contention that the record of the permanent injunction hearing does not support a finding of actual competition at that time, there was adequate evidence from which a lack of good faith could be found in the plaintiffs' demand for certain information. Such matters as copies of purchase contracts, methods of arriving at bids, and the quoted price for sale of items are of dubious value to the average reasonable investor in determining the worth of his stock.
 
 
 29
 Similarly the court did not err in concluding that disclosure of the Mosser five-year plan to plaintiffs could do more harm than good and was not required under the circumstances. Again, the inquiry was directed to whether the company's projections, research and development data, or future markets would have been material to a reasonable investor's decision. While it is true that such details may have been of value to plaintiffs with respect to the operation of Damper Design, it does not follow that this information would have been material to a reasonable Mosser shareholder. We need not adopt a rule applicable in all situations with respect to future projections[5] but merely conclude in the circumstances here that disclosure was not required.
 
 
 30
 We find no merit in plaintiffs' argument that they should have been advised, as were the other minority stockholders, that if litigation resulted in raising the price Mosser was required to pay for the stock, all would be treated alike. Ecolaire would have been bound by its promise in one of two events plaintiffs' success in this litigation or in the appraisal proceeding pending in state court. In either instance, Ecolaire would have been required to pay the higher price to the plaintiffs. To argue that the failure to communicate the promise to them was a detriment is to ignore the basic fact that Ecolaire was simply agreeing to pay all minority shareholders the same price for their stock.[6]
 
 
 31
 We also reject plaintiffs' contention that Ecolaire placed a high, subjective value on the minority shares and that this fact should have been disclosed to the shareholders. In devising this argument, plaintiffs rely on two calculations that purportedly demonstrate Ecolaire's assessment of Mosser's worth. The first calculation arrived at a subjective value by dividing Ecolaire's cost in exercising its warrants by the percentage of increased control Ecolaire gained by the exercise. The second calculation figured the total cost to Ecolaire of assuming control, which consisted of buying all minority shares, exercising all Ecolaire warrants, and permitting the minority to exercise theirs.
 
 
 32
 As the district court noted, there is no evidence that Ecolaire engaged in similar calculations of a subjective valuation of Mosser and knowingly omitted them from its disclosure statement. Mosser did fully disclose its method of arriving at a value of $8 per share. Furthermore, if minority shareholders wished to attach a subjective value to Ecolaire's plan, the objective data released by Mosser allowed them to do so. Indeed, it was these figures that plaintiffs relied on in making their computations. Therefore, we agree with the district court's conclusion that the failure to calculate and disclose this appraisal of Mosser stock did not constitute a material omission.
 
 
 33
 Having found no error in the inferences drawn by the district court or in its holding that Mosser did not omit or misstate material facts in its financial reports, we affirm the rejection of these federal claims. We turn, then, to the plaintiffs' charges of absence of business purpose and unfairness, alleged to constitute a basis for recovery under both federal and Pennsylvania law. Healey v. Catalyst Recovery of Pennsylvania, Inc., supra.
 
 
 34
 The parties do not dispute that in Pennsylvania, as is true in other states, majority stockholders owe a fiduciary duty to minority owners. Weisbecker v. Hosiery Patents, Inc., 356 Pa. 244, 252, 51 A.2d 811, 814 (1947). A merger intended solely to "freeze out" or "cash out" minority equity holders from their positions may be enjoined as an attempted breach of that fiduciary duty. Id.[7] This is so despite statutory provisions remitting dissenting stockholders to the remedy of appraisal in the event of a merger. Pa.Stat.Ann. tit. 15, § 1515 K (Purdon 1967).
 
 
 35
 In In re Jones & Laughlin Steel Corp., 488 Pa. 524, 412 A.2d 1099 (1980), the Pennsylvania Supreme Court stated that a stockholder's sole postmerger remedy was the statutory appraisal set out in § 515 of the Business Corporation Law, Pa.Stat.Ann. tit. 15, § 1515 (Purdon 1967 & Cum.Supp.1981). But the court recognized that in Weisbecker v. Hosiery Patents, Inc., supra, it had held that a freezing out of minority stock owners for the purpose of continuing the enterprise for the benefit of majority holders was a violation of fiduciary duty and could be enjoined. In addition, the court noted that a statutory amendment of July 20, 1968, impliedly recognized such a right by prohibiting a shareholder injunction "in the absence of fraud or fundamental unfairness." Pa.Stat.Ann. tit. 15, § 1005 E (Purdon Cum.Supp.1981). Under Pennsylvania law, then, a minority shareholder may act before a merger to seek an injunction.
 
 
 36
 In re Jones & Laughlin, supra, lacks a definition of the elements of fundamental fairness and the Pennsylvania Business Corporation Law furnishes no guidance. In similar circumstances the Supreme Court of Delaware has had occasion to discuss the scope of the fiduciary duty owed by the majority since a cash out may be enjoined under the law of that state if found to be unfair or without a business purpose. While not controlling, the rationale of those decisions is helpful.
 
 
 37
 Singer v. Magnavox Co., 380 A.2d 969 (Del.1977), rejected the contention that a stockholder's rights in stock are exclusively the value of his investment, not its form, but later cases demonstrated that a minority could be deprived of its share by a vote of the majority. Tanzer v. International General Industries, Inc., 379 A.2d 1121 (Del.1977), for example, held that a merger to facilitate long-term financing by the parent corporation advanced a legitimate business purpose and would be permissible if shown to be entirely fair. Although a majority may not use a minority take out when its purpose is simply to eliminate the minority, in Coleman v. Taub, 638 F.2d 628 (3d Cir. 1981), we held in applying Delaware law, that a contractual agreement such as a buy-back clause may alter the fiduciary duty between the majority and minority in such a way that a cash out would not be a breach of the majority's duty.
 
 
 38
 In this case, there was a legitimate business reason and it was presented to the minority stockholders. Consequently, there was no misrepresentation under federal law. Nor was there any "freezing out of minority holders with the purpose of continuing the business for benefit of the majority holders" in violation of Pennsylvania law. In re Jones & Laughlin Steel Corp., supra at 531, 412 A.2d at 1103, quoting Weisbecker v. Hosiery Patents, Inc., supra at 252, 51 A.2d at 814. Whether viewed from the perspective of the majority or of the company undergoing the merger, there was a valid business purpose for the merger. Ecolaire, which was risking its capital, wanted to reap all the benefits of its investment, and Mosser would be able to secure a loan for a significant expansion of its business.
 
 
 39
 The heart of plaintiffs' state law argument is that the elimination of the minority through a merger is inherently unfair. But the fiduciary duty owed by the majority to the minority does not prevent a cash out under Pennsylvania law. There must be fraud or fundamental unfairness before such a merger may be enjoined by the courts.
 
 
 40
 The defendants in this case established that the price offered for the stock of the minority holders was the same as that given in a recent arms length transaction. They also showed that the timing of the merger was related to the planned expansion of Mosser. The plaintiffs allege that because the proposal has not been carried out, there was fundamental unfairness in the defendants' assertion that the financing needs of Mosser were a valid business reason. However, the plaintiffs did not show that at the time of the merger there was no intention to proceed with the project or that it will not be done in the future. Their argument therefore is not persuasive.
 
 
 41
 In fact, the merger was "in the best interest of Mosser," as the district court found. 488 F.Supp. at 1341. It was consummated in accordance with Pennsylvania law and without fraud or fundamental unfairness. The district court's findings of basic facts were not clearly erroneous and there was no error in the conclusions it drew from those facts.
 
 
 42
 We have reviewed the other arguments of the plaintiffs and find them to be without merit.
 
 
 43
 Accordingly, the judgment of the district court will be affirmed.
 
 
 
 *
 The Honorable Barron P. McCune, United States District Court for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The opinion of the district court is reported at 488 F.Supp. 1328 (E.D.Pa.1980)
 
 
 [2]
 One plaintiff, Donald K. Hager, owned only warrants to purchase stock
 
 
 [3]
 The quotation is preceded in the opinion by a sentence in which the Court characterized materiality as a mixed question of law and fact involving the application of a legal standard to a particular set of facts. TSC Indus. Inc. v. Northway, Inc., supra at 450, 96 S.Ct. at 2132
 
 
 [4]
 The parts of the two memoranda that plaintiffs contend demonstrate that phantom shares formed part of the consideration were written by the vice president who admitted making such a proposal. Ample evidence supports the finding, however, that Ecolaire's president rejected this plan and that the sale was solely for cash
 
 
 [5]
 The policy currently adopted by the SEC permits, but does not require, disclosure of forecast data in annual reports and documents filed with the Commission. 17 C.F.R. § 230.175 (1980). The advisability of revealing such information is a matter of some debate. See generally Kripke, A Search for a Meaningful Securities Disclosure Policy, 31 Bus.Law. 293, 298 (1975); Note, Disclosure of Future-Oriented Information Under the Securities Laws, 88 Yale L.J. 338 (1978)
 
 
 [6]
 It has been argued that one shortcoming of appraisal proceedings is that only dissenting shareholders realize the value of their stock. As long as some shareholders choose not to dissent, a company gains from offering less than fair value for the stock. See Brudney and Chirelstein, Fair Shares In Corporate Mergers and Takeovers, 88 Harv.L.Rev. 297, 306-07 (1974); Greene, Corporate Freeze-out Mergers: A Proposed Analysis, 28 Stan.L.Rev. 487, 503-04 (1976). Ecolaire's offer to the nondissenting shareholders eliminated this disparity
 
 
 [7]
 The scope of the majority's fiduciary duty in freezeout mergers has been the subject of frequent comment. See, e. g., Borden, Going Private Old Tort, New Tort or No Tort?, 49 N.Y.U.L.Rev. 987 (1974); Brudney and Chirelstein, A Restatement of Corporate Freezeouts, 87 Yale L.J. 1354 (1978); Greene, Corporate Freeze-out Mergers: A Proposed Analysis, 28 Stan.L.Rev. 487 (1976); Lorne, A Reappraisal of Fair Shares in Controlled Mergers, 126 U.Pa.L.Rev. 955 (1978)
 The SEC recently promulgated a rule requiring the issuer to comment on the fairness of the transaction to the minority. 17 C.F.R. § 240.13e-3 (1980). For discussions of this rule, see Note, Regulating Going Private Transactions: SEC Rule 13e-3, 80 Colum.L.Rev. 782 (1980); Note, Freezeout Merger Regulation: An SEC Rule Joins State Efforts, 37 Wash. & Lee L.Rev. 964 (1980).