815 F.2d 925
 55 USLW 2582, Fed. Sec. L. Rep. P 93,216
 LANDY, Gloria and Landy & Spector Pension Plan, on behalf of
themselves and all others similarly situated, Appellants,
v.
AMSTERDAM, Gustave G., Baird, John W., Barness, Herbert,
Bol, Mary Edrienne, Executrix of the State of Bol, Klaas,
deceased, Greenfield, Robert K., Mann, George S., Waisberg,
Lorie, Zalinsky, Edmund L., Unicorp American Corporation,
Unicorp Financial Corporation, and Greit Realty Trust, Appellees.
 No. 86-1368.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 22, 1987.
Decided April 7, 1987.
 
 Richard M. Meyer (argued), Robert A. Wallner, Milberg Weiss Bershad Specthrie & Lerach, New York City, Sherrie R. Savett, Berger & Montague, P.C., Philadelphia, Pa., for appellants.
 Joseph W. Swain, Jr. (argued), John E. Caruso, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellees, Gustave G. Amsterdam, John W. Baird, Herbert Barness, Edmund L. Zalinski, Unicorp American Corp. and GREIT Realty Trust.
 William T. Hangley, Claire Rocco, Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, Philadelphia, Pa., for appellees, Mary E. Bol, Executrix of the Estate of Klaas Bol, and Robert K. Greenfield.
 Kenneth I. Levin, Joyce K. Hackenbrach, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellees, George S. Mann, Lorie Waisberg, and Unicorp Canada Corp.
 Before GIBBONS, Chief Judge, WEIS, Circuit Judge, and ZIEGLER, District Judge.*
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 Former minority shareholders of GREIT Realty Trust (GREIT), a Pennsylvania real estate investment trust, appeal from a final judgment in favor of Unicorp American Corporation (UAC), a Delaware corporation, Unicorp Financial Corporation (Canadian), a Canadian corporation, and certain trustees of GREIT. The minority shareholders' suit charges the defendants with various violations of the federal securities laws and the common law of Pennsylvania in connection with the merger of GREIT and UAC. The district court directed a verdict in favor of the defendants at the end of the shareholders' case. The minority shareholders contend that the court erred both on the Pennsylvania law and the federal law claims. They also claim that the court erred in excluding certain evidence. We affirm.
 
 I.
 
 2
 The challenged merger between GREIT and UAC, pursuant to a merger agreement dated April 20, 1981, was approved by GREIT sharholders at a meeting on October 29, 1981. Prior to the merger, GREIT owned office buildings, shopping centers, and land in several states. It also owned 404,000 shares, a 15 per cent interest, of San Francisco Real Estate Investors (SFI), another real estate investment trust. Canadian, prior to the merger, owned all the outstanding shares of UAC, 50 per cent of the shares of GREIT, and 700,000 shares, a 26 per cent interest, of SFI. Canadian had begun acquiring GREIT shares in 1978, and by 1981 had become its majority shareholder. Two representatives of Canadian, defendants Mann and Weisberg, held seats on GREIT's board of trustees. The remaining six seats on the GREIT board were held by trustees who, though they had no interest in Canadian, sat as trustees of UAC as well.
 
 
 3
 GREIT's acquisition of SFI shares began in mid-1980, during which time Canadian agreed to refrain from purchasing or selling SFI shares, and from other acts which would affect the market of SFI shares. By October 1980, GREIT had acquired its 15 per cent interest in SFI. In an agreement signed on October 21, 1980, GREIT released Canadian from its earlier restriction on trading SFI stock. In return, Canadian granted GREIT a call option, under which GREIT could purchase from Canadian all SFI shares acquired by Canadian between October 21, 1980 and December 31, 1980. The option date was later extended to April 30, 1981. The call option was not assignable without Canadian's written consent, and the option price was "acquisition cost ... including brokerage commissions, and applicable interest costs." See Letter from Unicorp Financial Corp. to GREIT Realty Trust (October 21, 1980).
 
 
 4
 During the period covered by the call option, Canadian acquired 554,480 shares of SFI. Had GREIT exercised the call option, its interest in SFI would have increased to 958,480 shares, or approximately 36 per cent. GREIT, however, never exercised the call option. Instead, Canadian retained its SFI shares, and on April 6, 1981, prior to the expiration of the call option, gave its interest in SFI to UAC, in exchange for 100 per cent of UAC's outstanding common and convertible preferred stock.
 
 
 5
 The merger agreement between GREIT and UAC was executed on April 20, 1981, ten days prior to the extended expiration date of the call option. The agreement provided for a share-for-share exchange of GREIT common stock for UAC common stock, with the surviving entity being a business corporation rather than a real estate investment trust. Combining Canadian's pre-merger interest in UAC with the UAC stock it would receive for its holdings in GREIT, the proposed merger resulted in Canadian owning 1,300,000 shares of UAC common stock, and 2,000,000 shares of UAC preferred stock, giving it 87 per cent of the total voting power of UAC.
 
 
 6
 Drexel Burnham Lambert, Inc., a financial adviser retained by GREIT, issued an opinion that the terms of the merger were fair to the minority shareholders. The merger was approved at a special meeting of GREIT shareholders on October 29, 1981. On that date, there were 997,500 shares of GREIT outstanding, of which 500,000 shares were owned by Canadian. Pursuant to the merger agreement, Canadian undertook not to vote its shares unless a majority of the balance of the 497,500 shares of GREIT owned by others voted in favor of the merger. Of these shares, 251,217 voted at the special meeting, with 202,906 voting in favor of the merger and 48,311 against it. Of the 202,906 favorable votes, 186,021 were cast by GREIT shareholders other than any defendant, or affiliate or family member of any defendant. Thus, 74 per cent of the unaffiliated voting minority shareholders of GREIT approved the merger, with the total favorable vote representing over 93 per cent of the shares actually voted.
 
 II.
 
 7
 The minority shareholders contend that they established a prima facie case of unfairness of the merger. Fairness of the merger to minority shareholders of a Pennsylvania real estate investment trust is significant; all parties agree that Pennsylvania law makes no provision for appraisal rights of minority shareholders in such a trust. Cf. Equity Corporation v. Brickley, 237 F.2d 839 (1st Cir.1956), cert. denied, 352 U.S. 989, 77 S.Ct. 387, 1 L.Ed.2d 368 (1957) (no appraisal rights in reorganization of a Massachusetts business trust absent provision in trust indenture). But cf. 15 Pa.Stat.Ann. Sec. 805 (Purdon 1967) (appraisal rights of minority shareholders in Pennsylvania business corporations). Thus, once the merger was approved, the minority shareholders had no option, in liquidating their holdings, other than sale of their shares in the market.
 
 
 8
 The unfairness on which the minority shareholders rely is the fact that the merger agreement, in fixing the ratio of the exchanges involved, attributed no value to GREIT's call option on Canadian's SFI shares. The failure to attribute some value to the call option, they contend, resulted in an overvaluation of Canadian's contribution to the merged enterprise, and an undervaluation of their contribution to UAC. The defendants, on the other hand, contend that the call option was of no value to GREIT, since the trust lacked the resources to exercise the option, and the option had expired by its terms long before the GREIT shareholders approved the merger.
 
 
 9
 Since the district court granted a directed verdict, our review is plenary. Finkle v. Gulf & Western, 744 F.2d 1015, 1021 (3d Cir.1984). The minority shareholders urge that we should reverse for two reasons--one legal and one factual. The legal argument is that the district court misapplied the burdens of proof on the issue of fairness to the minority interests. The factual argument is that assuming plaintiffs had the burden of coming forward on the fairness issue, they satisfied it.
 
 A.
 
 10
 The minority shareholders contend, and the district court appears to have assumed, that their evidence would permit a finding that fiduciaries participated on both sides of the merger negotiations. Since UAC's trustees appear to have owed a fiduciary obligation both to GREIT and Canadian, we will proceed on the same assumption. The minority shareholders argue that with fiduciaries on both sides of the transaction, Pennsylvania law permits objecting shareholders to "offer the prospectus, [prove the transaction], and rest." They urge that the burden of coming forward with proof of the fairness of the transaction, and the ultimate risk of non-persuasion, should rest on the fiduciary parties who engaged in self-dealing.
 
 
 11
 The district court assumed, arguendo, that the ultimate risk of non-persuasion with respect to fairness would, under Pennsylvania law, fall upon fiduciaries who engaged in self-dealing. The court rejected, however, the contention that objecting shareholders could, in the context of this case, merely offer the prospectus and rest. At least in cases such as this, in which a majority of the disinterested directors and shareholders approved the transaction, Pennsylvania law, the court held, required that the objectors come forward with some evidence of unfairness before the fiduciaries would be put to their proof.
 
 
 12
 The parties point to no controlling Pennsylvania statute or case. A provision of the Pennsylvania Corporate Code deals with transactions involving interested directors,[1] but does not explicitly resolve the question of the burden of coming forward. Finding no Pennsylvania case in point, the district court predicted that Pennsylvania would follow the law of Delaware. See, e.g., Dower v. Mosser Industries, Inc., 648 F.2d 183, 198 (3d Cir.1981).
 
 
 13
 The Delaware Supreme Court addressed the burden of coming forward with evidence of unfairness of a merger approved by a disinterested majority in Weinberger v. UOP, Inc., 457 A.2d 701 (Del.1983). In Weinberger, Signal Corp. owned 50.5% of the shares of UOP, Inc., and elected six of UOP's thirteen directors. Signal proposed a merger, which was challenged by minority shareholders of UOP. In the trial court, Vice Chancellor Brown upheld the merger, ruling that while the ultimate burden of showing fairness rests on the majority shareholder, "it is the burden of the plaintiff attacking the fairness of the merger to demonstrate some need to invoke this obligation on the part of the majority shareholder." Weinberger v. UOP, Inc., 426 A.2d 1333, 1345 (Del.1981), rev'd, 457 A.2d 701 (Del.1983). While the Delaware Supreme Court reversed on the merits, it agreed with the lower court that the objector must first demonstrate some basis for invoking the fairness obligation. Justice Moore wrote:The Chancellor also held that even though the ultimate burden is on the majority shareholder to show by a preponderance of the evidence that the transaction is fair, it is first the burden of the plaintiff attacking the merger to demonstrate some basis for invoking the fairness obligation. We agree with that principle. However, where corporate action has been approved by an informed vote of a majority of the minority shareholders, we conclude that the burden entirely shifts to the plaintiff to show that the transaction was unfair to the minority. See, e.g., Michelson v. Duncan, Del.Supr., 407 A.2d 211, 224 (1979). But in all this, the burden clearly remains on those relying on the vote to show that they completely disclosed all material facts relevant to the transaction.
 
 
 14
 Weinberger v. UOP, Inc., 457 A.2d at 703. At a later point, Justice Moore restated that the ultimate risk of non-persuasion rests with the fiduciary who stands on both sides of the transaction. Id. at 710.
 
 
 15
 The minority shareholders in the present dispute contend that the district court erred in predicting that the Pennsylvania Supreme Court would follow Weinberger, particularly when dealing with a real estate investment trust which makes no provision for appraisal rights. We note, however, that the Weinberger court did not qualify its rule on the burden of coming forward by a reference to appraisal rights. Moreover, the existence of such rights is only one factor to be take into account in assessing the fairness of a transaction involving self-dealing. Tanzer v. International Gen. Indus., Inc., 402 A.2d 382, 393 (Del.Ch.1979).
 
 
 16
 We agree with the district court that the Pennsylvania Supreme Court would be likely to follow the Weinberger rule, requiring that any party challenging a transaction on the ground of self-dealing by a fiduciary must first come forward with some basis for invoking the fairness obligation. We do so because that rule makes practical sense. A party challenging a transaction ought not to be able to invoke the remedial powers of the court without making any showing that the transaction was unfair. The "prove the prospectus and rest" rule seems unduly likely to produce nuisance litigation. We do not believe that the Pennsylvania Supreme Court would permit the plaintiff to avoid a directed verdict merely by proving self- dealing alone.
 
 B.
 
 17
 The minority shareholders also contend that even if the district court was correct in requiring them to come forward with some evidence of unfairness, they satisfied the burden. Appellants argue that the evidence adduced at trial established the unfairness of the merger terms in several different ways.
 
 
 18
 (1) Value of the Call Option
 
 
 19
 First, the minority stockholders contend that their evidence established that GREIT shares were undervalued by the terms of the merger agreement, because no value was attached to the call option. They rely on the testimony of their valuation expert, who testified to the effect that if GREIT had been treated as the beneficial owner of the 541,480 SFI shares subject to the call option, its interest in SFI would have been entitled to a "control premium" of 25 per cent over the market value. The clear defect in this argument, however, is that the call option expired on April 20, 1981, and thus had no value as of the October merger date.
 
 
 20
 The minority shareholders attempt to cure this defect by arguing that the interested trustees breached their fiduciary duty by failing to exercise the call option prior to April 30, 1981. The cost of exercising the call option would have been $17,516,628. The evidence of record disclosed that in the period between October 1980 and April 1981, GREIT was in such financial straits that it was in no position to exercise the call option. The minority shareholders suggest that this sum could have been raised by selling GREIT-owned real estate or by some scheme of creative borrowing, the two financing methods suggested by their valuation expert. However, as the district court observed, there was no evidence introduced at trial of what real estate could have been liquidated, the price at which the real estate could have been sold, or who would have loaned GREIT the necessary funds. Indeed, two former unaffiliated trustees of GREIT testified that in their judgment GREIT did not have and could not have obtained funds necessary to exercise the call option. Further, the expert who suggested the feasibility of partially liquidating real estate, or borrowing substantial funds, conceded that he had not prepared any study as to the actual availability of a method to fund the exercise of the call option. Thus, the trial court did not err in holding that the evidence of non-exercise of the call option would not permit a finding of unfairness.
 
 
 21
 (2) Liquidation Instead of Merger
 
 
 22
 The minority shareholders contend that the merger was unfair, since they would have fared better had GREIT been liquidated rather than merged with UAC. In support of this contention, the minority shareholders rely on a reference in the prospectus to the opinion of GREIT trustee Klaas Bol that GREIT could have been liquidated with a realization of $25-35 per share.[2] Bol, nevertheless, testified that the merger terms were fair. There is no evidence, moreover, that in rejecting Bol's pre-merger opinion, the trustees acted inconsistently with sound business judgment; rather, the record reflects that the trustees relied on the opinion of Drexel Burnham Lambert, Inc. to the effect that the merger terms were fair to GREIT shareholders. Under Pennsylvania law, reliance on an independent opinion is a defense to a charge of unfairness. See, e.g., Evans v. Armour and Company, 241 F.Supp. 705, 713-14 (E.D.Pa.1965). Finally, a merger which produces new stock with a market value lower than liquidation value is not unfair as a matter of law. See Sterling v. Mayflower Hotel Corp., 33 Del.Ch. 293, 93 A.2d 107 (1952). Thus the trial court did not err in holding that the minority stockholders failed to meet the burden of coming forward with evidence of unfairness by reference to Mr. Bol's early preference for liquidation.
 
 
 23
 (3) The Premium for Canadian's Shares in SFI
 
 
 24
 The minority shareholders point out that the trustees, in fixing the merger terms, ascribed a 10 per cent control premium to Canadian's 26 per cent ownership of SFI, while they ascribed no control premium to GREIT's 15 per cent ownership. The appellants contend that Canadian's premium was shown by the evidence to be unfair.
 
 
 25
 The decision to ascribe a premium to Canadian's block of SFI shares was based upon the independent opinion of Drexel Burnham Lambert, Inc. The premium represented the value of Canadian's relinquishment of a controlling block of shares; indeed, even the minority shareholders' expert conceded in testimony that Canadian would be entitled to a premium of up to 20 per cent for its control block of SFI shares. Moreover, there was no evidence introduced at trial that GREIT's 15 per cent block in SFI possessed any added control value. Thus, the district court did not err in disregarding the control block premium as evidence of unfairness.
 
 
 26
 (4) Diluting the Voting Strength of the Minority Shareholders
 
 
 27
 The minority shareholders complain that prior to the merger, Canadian had 50.1 per cent of the voting power in GREIT, whereas after its completion, Canadian had 86.9 per cent of the voting power of UAC. This complaint, however, does not translate into unfairness. The evidence at trial established that prior to the merger, Canadian, as majority shareholder, could elect all of GREIT's directors. In connection with the merger, UAC undertook to amend its certificate of incorporation to provide for cumulative voting in the election of directors. Thus, as a result of the merger, the minority shareholders were assured greater board representation than they had been previously. Moreover, this complaint overlooks the patent reality that Canadian contributed to UAC both its 51.1 per cent interest in GREIT and its 26 per cent interest in SFI. The district court therefore properly rejected the change in voting power as evidence of unfairness.
 
 
 28
 (5) Canadian's Receipt of Preferred Stock
 
 
 29
 The minority shareholders complain that while shareholders other than Canadian received only UAC common stock, Canadian also received two million shares of UAC 9 per cent preferred stock with a $10 million preference in the event of liquidation. The minority shareholders also contend that common shareholders were not paid dividends after the merger. These facts, however, do not constitute unfairness.
 
 
 30
 The transaction between Canadian and UAC was fully disclosed in the proxy statement. The proxy statement also disclosed that the shares were to be issued in exchange for the transfer of 700,000 shares of SFI having a market value of $23,500,000, on which Canadian was receiving dividends of $1,232,000 a year. Since the UAC preferred dividends could amount to only $900,000 a year, the evidence thus demonstrated that this exchange benefitted UAC. Further, the complaint that following the merger UAC did not pay dividends to common shareholders does not bear upon the fairness of the exchange. The district court therefore properly rejected the issuance of preferred stock to Canadian as evidence of unfairness.
 
 
 31
 (6) The Change to a Business Corporation
 
 
 32
 The minority shareholders complain that as shareholders in a real estate investment trust they received "passed through" income free from federal income taxation, whereas since UAC is a business corporation, the income will be subject to tax. They also complain of changes, pre- and post-merger, in per-share earnings and book value.
 
 
 33
 As the district court noted, however, all these matters were fully disclosed in the proxy statement, and no evidence was offered from which a factfinder could quantify their effect. Absent such evidence, it is impossible to tell how these matters bear on the question of fairness. Thus, the district court properly rejected them as evidence of unfairness.
 
 
 34
 Exercising plenary review, we conclude that the minority shareholders did not produce any evidence demonstrating a basis for invoking the fairness obligation of Canadian to the minority shareholders of GREIT. That being so, we need not address the second step in the analysis made in Weinberger; namely, whether when a disinterested majority of directors and shareholders votes in favor of the merger, the burden of persuasion of unfairness shifts to the objectors.
 
 III. Nondisclosure Claim
 
 35
 The minority shareholders also contend that the merger proxy statement, in violation of section 14(a) of the Securities and Exchange Act of 1934, 48 Stat. 895, 15 U.S.C. Sec. 78n(a) (1982) and the rules promulgated thereunder, contains statements which are incomplete and materially misleading. They concede that they bear the burden of proof on this federal law claim. To avoid a directed verdict on this claim, they must produce evidence that the omissions and misrepresentations of which they complain were material to a reasonable shareholder's vote on the merger. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The minority shareholders point to three alleged misstatements or omissions.
 
 A. The Possibility of Liquidation
 
 36
 In trustee Bol's original draft of his objection to the merger, he pointed out that GREIT had sold some properties for sums equalling or exceeding their appraised value. The proxy statement mentioned Bol's support for liquidation, as well as his belief that liquidation could realize approximately $25-$35 per share. It noted, further:Members of the Board of Trustees were personally aware of instances where amounts actually realized in liquidation of other real property interests owned by parties other than the Trust, of a size and nature generally comparable to those of the Trust, had been substantially lower than the appraised current fair market values of such other real property interests. Such instances were deemed relevant in considering what the Trust might actually realize if it liquidated its properties.
 
 
 37
 The proxy statement included financial statements which disclosed the prices at which the GREIT properties had been sold, but not the appraised values of those properties. The minority stockholders contend that the failure to disclose the appraised values, along with the sales prices of GREIT properties sold, was a material omission likely to mislead stockholders as to the attractiveness of the liquidation option.
 
 
 38
 The minority shareholders' argument is without merit. Three of the five sales to which the minority stockholders refer were subject to agreements of sale at the time of the valuation, and thus the appraised values to which they refer merely reflected the agreed-upon prices. Therefore, the claimed nondisclosure deals with appraisals of two properties, the subjects of isolated sales. The nondisclosure of these appraisals, however, does not impugn the truthfulness of the disclosure of the reasons why the trustees rejected liquidation as an alternative to merger. Moreover, we are not prepared to hold that by the addition of this information to the prospectus, "there [is] a substantial likelihood that the disclosure ... would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus., Inc. v. Northway, Inc., 426 U.S. at 449, 96 S.Ct. at 2132.
 
 B. The Call Option
 
 39
 The minority shareholders contend that the proxy statement failed to disclose the number of shares covered by GREIT's call option on SFI shares owned by Canadian. This information, they contend, would have permitted disinterested shareholders to reach their own determination as to the fairness of the merger, in the light of defendants' conduct during the merger negotiations.
 
 
 40
 In Part II, above, we hold that no evidence was presented at trial to support the contention that the expired call option was of any value to GREIT. The same lack of evidence is dispositive of the argument that omission of the details concerning the call option was a material misrepresentation. There is no evidentiary basis for an inference that a reasonable shareholder would consider the omitted information important in deciding how to vote.
 
 C. The Vote Necessary to Approve the Merger
 
 41
 The minority shareholders also claim that the proxy statement failed to disclose the percentage of shareholder vote necessary to approve the merger, and misled shareholders into believing that an abstention was the equivalent of a vote against the merger. This contention is inconsistent with the clear wording of the proxy statement, which plainly states that the merger requires approval of a majority of shares, not owned by Canadian, "being voted at the meeting."
 
 IV.
 
 42
 The final contention of the minority shareholders is that they should be granted a new trial because the court erred in excluding expert opinion evidence relevant to the feasibility of successfully liquidating GREIT. The court precluded the plaintiffs' expert from testifying about a study of other real estate investment trusts and other businesses which had been liquidated. Upon examination, however, the expert conceded that in preparing his study, he had not compared the properties of these businesses with the properties owned by GREIT. Absent a showing of comparability, we cannot find an abuse of discretion in the exclusion of this evidence. See Fed.R.Evid. 403.V.
 
 
 43
 The district court did not err in granting a directed verdict on plaintiffs' Pennsylvania law claim of breach of fiduciary duty or on plaintiffs' claims of violation of the Securities and Exchange Act of 1934. The district court did not commit an abuse of discretion in excluding evidence of non-comparable liquidations. The judgment appealed from will therefore be affirmed.
 
 
 
 *
 Hon. Donald E. Ziegler, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 15 Pa.Stat.Ann. Sec. 1409.1 (Purdon Supp.1985) provides in pertinent part:
 A. No contract or transaction between a business corporation and one or more of its directors or officers, or between a business corporation and any other corporation, partnership, association, or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for such reason, or solely because the director or officer is present at or participates in the meeting of the board which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:
 (1) The material facts as to his interest and as to the contract or transaction are disclosed or are known to the board of directors and the board in good faith authorizes the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or
 (2) The material facts as to his interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract of transactions is specifically approved in good faith by vote of the shareholders; or
 (3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors or the shareholders.
 
 
 [2]
 The market price of GREIT shares pre-merger was $12.00, while UAC stock traded post-merger in the $11.88-$13.00 range