George H. KEYSER and Walter Shearer, individually, as class representatives on behalf of others similarly situated, and derivatively on behalf of Commonwealth National Financial Corp., Plaintiffs,

v.

COMMONWEALTH NATIONAL FINANCIAL CORPORATION, et al., Defendants.

Civ. No. 85–1853.

United States District Court, M.D. Pennsylvania, Third Circuit Division.

June 30, 1987.

239

David Aufhauser, Williams & Connolly, Washington, D.C., John Havas, Harrisburg, Pa., for plaintiffs.

Walter T. McGough, Anthony J. Basinski, Pittsburgh, Pa., Robert B. Hoffman, Harrisburg, Pa., for Mellon Bank Corp.

Jon A. Baughman, Joyce K. Hackenbrach, Seth D. Linfield, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Lewis S. Kunkel, Jr., Pepper, Hamilton & Scheetz, Harrisburg, Pa., for Com. Nat. Financial Corp., individual director.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Presently before the court[1] is defendants' Motion for Summary Judgment. All briefs having been filed and oral argument completed as of March 30, 1987, the motion is ripe for disposition. Plaintiffs allege various inadequacies in proxy material used to solicit a merger between Commonwealth National Financial Corporation (Commonwealth) and Mellon Bank Corporation (Mellon) in violation of §§ 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(a). In addition, plaintiffs maintain that Commonwealth's Board of Directors (Board) breached their fiduciary duty of care owed to Commonwealth's shareholders under Pennsylvania law by ultimately approving a merger with Mellon. For the reasons set forth below, defendants' Motion for Summary Judgment will be denied as to the alleged adequacy of the proxy statement in failing to mention Meridian's proposals under Rule 14a-9, denied as to the § 10(b) claim, granted as to the Rule 14a-9 claim as it pertains to the alleged failure to correctly set forth the background of the Mellon merger and the failure to disclose purported conflicts of interest of Commonwealth's management and directors and denied as to the claim that the Board breached its fiduciary duty under state law by approving the Mellon merger.[2]

---

1. Per stipulation of the parties, plaintiffs' Motion and Amended Motion to Compel and defendants' Motion for a Protective Order have been resolved.

2. Plaintiffs filed a Motion for Certification of a Class Action on March 19, 1986. Plaintiffs also filed a Memorandum in support of that motion. Defendants responded by filing a Joint Motion for the Setting of a Timetable for Discovery and Briefing Concerning Plaintiffs' Motion for Certification of a Class Action on April 8, 1986. Plaintiffs responded to defendants' Motion for the Setting of a Timetable for Discovery on April 15, 1986. In that response, plaintiffs did not object to a further continuance of the class certification issue. In addition, in their response, plaintiffs indicated that the issue of class definition may be arrived at through informal discussions and amicable resolution. In light of the court's disposition of defendants' motion, the parties will be directed to meet in an attempt "[t]o resolve any outstanding class questions ... so that possible stipulations on the same may be agreed upon." Document 53 of the Record at 5. Upon notification from the parties as to any agreed upon stipulations and an agreed upon timetable for the filing of supporting and opposing memorandums and other documentation, the court will consider the Motion for Class Action Certification. Again, as

## PROCEDURAL BACKGROUND

Plaintiffs, shareholders in Commonwealth, instituted this action alleging that defendants mailed false and misleading proxy materials soliciting shareholder approval of a proposed merger in violation of section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and state law. Specifically, plaintiffs allege violations of §§ 10(b) and 14(a) of the 1934 Act, 15 U.S.C. §§ 78j(b), 78n(a) and rules and regulations promulgated under these sections. Named defendants are Commonwealth, Mellon and individual members of the Board of Directors of Commonwealth. Plaintiffs also allege that the Commonwealth directors violated the fiduciary duty owed to their shareholders under Pennsylvania law when they ultimately approved a merger with Mellon by executing an investment and warrant agreement granting Mellon a lock-up option[3] without adequately informing themselves and failing to maximize the price that could have been obtained for Commonwealth in such a merger transaction. In a forty-five (45) page Memorandum and Order the court denied plaintiffs' Motion for Summary Judgment on April 7, 1986. In that Memorandum and Order, the court analyzed in detail the factual background of the case as it then existed. For purposes of this motion, the court will concentrate on the factual record as it has developed since April 7, 1986. Indeed, as will be apparent, a good deal of the factual background set forth in the April 7th Opinion remains unchanged.

## FACTUAL BACKGROUND

In examining the present factual background, the court must construe the facts in a light most favorable to plaintiffs. The court cannot resolve conflicting factual contentions on this Motion for Summary Judgment, and defendants' motion should be granted only if defendants have established that no material facts are in dispute

and that they are entitled to judgment as a matter of law.

Initially, the court recognizes that by stipulation dated August 19, 1986, the parties resolved their discovery disputes. As plaintiffs maintain, many documents have now been produced which were not available to this court when it issued its earlier Memorandum and Order on April 7, 1986. In any event, the present record reveals the following.

Since 1982 Meridian Bancorp, Inc. (Meridian) has been interested in acquiring Commonwealth, although Commonwealth was not interested at the time as it desired either to remain independent or to try and improve its value for a future merger. Nonetheless, on January 30, 1985, Meridian made an affirmative overture to Commonwealth by a letter from Meridian's President Samuel A. McCullough (McCullough) suggesting discussions relative to a possible merger. Commonwealth's Executive Committee considered the letter and decided to obtain investment banking advice by retaining Goldman, Sachs & Company (Goldman Sachs) for the purpose of evaluating the options available to Commonwealth. Goldman Sachs advised that it would be premature to merge with any prospective acquirers and Commonwealth's Board, after an in depth discussion at its April 17, 1985 meeting, resolved to remain independent until it became a more valuable merger partner. In the summer of 1985, Commonwealth decided to raise capital equity and on September 10, 1985, filed a preliminary prospectus with the Securities and Exchange Commission for the sale of 718,750 shares of common stock. Although having been advised of Commonwealth's desire to remain independent, on September 12, 1985, Meridian sent a letter to Commonwealth and Goldman Sachs outlining a proposal to purchase all of Commonwealth's stock by exchanging it for

---

with the various discovery motions filed by the parties, the court anticipates that, at the very least, the parties will agree upon a proper schedule for the filing of documentation in support of, and in opposition to, this motion.

3. The stock purchase warrant or lock-up allows the party to whom it is issued to buy a specified amount of stock at a stipulated price at a specific time. In this way, the lock-up effectively impedes other competitors from blocking a proposed merger.

Meridian common stock with an approximate value of $38.00 per share.

Commonwealth discussed Meridian's September 12th letter with Goldman Sachs on Friday, September 13, 1985. Thereafter, between September 12th and September 17th, Goldman Sachs requested Meridian to withdraw the letter as Commonwealth had decided to remain independent. A special meeting of Commonwealth's Executive Committee was held on the evening of September 17, 1985. The Executive Committee resolved against entering into negotiations with Meridian based on the September 12th letter after deliberating for four (4) hours. The full Board of Directors adopted this resolution on September 18, 1985 after a presentation by Goldman Sachs. On September 19, 1985, Meridian issued a press release containing the terms of the letter, Commonwealth's rejection thereof and the assertion that the "offer remained open."

Subsequently, by letter dated September 25, 1985, Meridian reaffirmed terms contained in the September 12th letter while indicating that said terms were open to negotiation. Additionally, Mellon became active in this scenario after Meridian's press release concerning the September 12th letter. David L. Martin (Martin), Senior Vice President in charge of Corporation Development at Mellon, discussed the possibility of a stake-out[4] with Charles F. Merrill (Merrill), Chief Executive Officer of Commonwealth, until September 27, 1985 when the subject of merger between Mellon and Commonwealth arose.

Specifically, Martin telephoned Merrill on September 12, 1985, to inform Merrill that Mellon could be helpful "in case something happened." It appears that Martin heard "rumors" that Commonwealth was going to receive an offer. In fact, in its prior ruling, the court noted that Martin telephoned Merrill "after hearing of Meridian's 'offer.'" On September 19, 1985, Merrill advised Martin that Commonwealth did not view Meridian's proposal as a friendly over-

ture and that Commonwealth desired to remain independent. Martin discussed a stake-out and this possibility was explored until September 27, 1985, when Merrill and Martin began to discuss merger. Merrill, after speaking with Goldman Sachs, asked Martin if Mellon was interested in immediate merger. Martin stated that Mellon recognized Commonwealth's desire to remain independent, but Martin conveyed Mellon's willingness to compete with other potential merger partners to Merrill. *See* Document 42 of the Record, Consolidated Statement of Material Facts Not in Dispute at 27–28. Although Martin attempted to discuss Mellon's objectives concerning merger in general, Merrill did not want to speak about the interests of management in a Mellon merger. *Id.* at 28.

Meridian, by letter dated September 30, 1985 to the Commonwealth Board, amended the terms of the September 12th letter to include a price of thirty-nine (39) dollars a share, while again asserting that any items were subject to negotiation. Importantly for purposes of the present motion, the letter stated "[p]lease be advised that if you do not inform us, before the close of business on Friday, October 4, 1985 of your intent to negotiate with us, we intend to withdraw our September 12 offer (as amended by this letter)." On October 1, 1985, Commonwealth issued its own press release again expressing its intent to remain independent.

At this point, *viz* October 1, 1985, Commonwealth and Mellon had superficially discussed the possibility of merger on September 27, 1985. Indeed, Mellon continued to work on a plan for a stake-out between Mellon and Commonwealth with its financial advisor Merrill, Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) between September 23, 1985 and October 4, 1985. On Tuesday, October 1, 1985, Martin and Mellon's investment firm Merrill Lynch met with Goldman Sachs at approximately 5:30 P.M. At some point on October 1st, Goldman Sachs asked if Mellon would consider

---

4. A "stake-out" is a minority investment in a corporation in which the helping corporation buys a block of stock thereby providing the target corporation with enough capital to avoid acquisition.

an up-front merger rather than a stake-out.[5]

Accordingly, despite the October 1st press release expressing Commonwealth's desire to remain independent, the subject of merger, previously discussed between Merrill and Martin, again was raised by Goldman Sachs later in the day on October 1st. In addition, during this time period, the proposed stake-out was still being discussed. The next series of pertinent events began three (3) days later on Friday, October 4, 1985.

Martin called Merrill on the afternoon of October 4, 1985 to formally express Mellon's interest in merging with Commonwealth. Merrill Lynch delivered a proposed term sheet to Goldman Sachs in the late afternoon on October 4, 1985 covering the proposed merger. The term sheet included a possible bid in the range of forty (40) to forty-two (42) dollars per share, as well as a Stock Purchase Warrant. In addition, the term sheet stated that the due diligence review was to be completed no later than Sunday, October 6, 1985. Consequently, at the close of business on October 4th, a definite agreement with Mellon had not been reached.

By October 6th, all negotiations apparently including the due diligence review, except with respect to price, had been completed. Document 42 of the Record at 37. Martin spoke to Richard Allen Sapp (Sapp) of Goldman Sachs on Sunday evening, October 6th. Sapp inquired as to the price Mellon was considering. Martin responded that he thought forty (40) dollars, although Commonwealth's earning potential would have to be discussed in more detail. Sapp responded somewhat negatively to this price. *Id.* at 38. Thus, even as late as October 6, 1985, no agreement on price had

been reached between Commonwealth and Mellon.

The deposition testimony of Geoffrey Shuff (Shuff), in-house counsel for Commonwealth, reveals that Shuff contacted members of Commonwealth's Board by telephone around midnight on October 6, 1985 to schedule a Board meeting for Tuesday, October 8th. *See* Document 42 of the Record at 38–39. In a press release issued by Commonwealth on October 1, 1985, in response to Meridian's September 30, 1985 letter, Merrill is quoted as saying "[t]he matter will be brought formally to the attention of Commonwealth's Board in due course." Document 35 of the Record, Tab 32 at 661b. Apparently, as of October 2, 1985, a Board meeting had not yet been scheduled. Sapp indicated in his deposition that Commonwealth desired Mellon's response to Commonwealth's merger proposal by October 4th because "we wanted to schedule a directors meeting for Monday to discuss the state of the world." Document 34 of the Record, Tab 11 at 281b. As Sapp commented, "we were really planning on having a board meeting Monday morning to discuss the state of affairs and wanted as much information as we could have to make recommendations by the close of business." *Id.* When questioned as to what he meant by the "state of affairs," Sapp agreed that Meridian's proposal was included along with other possibilities that had been discussed. *Id.* On October 4th, Gregory Sutliff (Sutliff), a Board member, in a tape recorded conversation with F. John Hagele, Esquire, Commonwealth's counsel, indicates that he, Sutliff, was aware of the Monday, October 7 Board meeting. Document 87 of the Record, Tab 32. As to what would be discussed at this meeting, Hagele told Sutliff "[w]ithout going into identities the third alternative is

---

5. Defendants concede that Goldman Sachs, after private conference, asked if Mellon would consider an up-front merger instead of the stake-out. Document 61 of the Record at ¶ 20. Plaintiffs state that Goldman Sachs acted with full authorization from Merrill. Document 68 of the Record at ¶ 19; Document 69 of the Record at 6; Document 106 of the Record at 5, ¶ 16. There is no indication that Goldman Sachs acted without Commonwealth's approval. Indeed,

Martin acknowledges that at the October 1st meeting the representatives of Goldman Sachs, Chuck Davis, Rick Sapp and John Powers, left the room "[p]erhaps to talk to Chip Merrill (sufficient time passed to have allowed such a conversation)." Document 27 of the Record, Tab 66 at #300139. Thus, the court can only conclude that Merrill approved Goldman Sachs' request for a merger to Mellon. *See* Document 34 of the Record, Tab 11 at 278b–280b.

that another opportunity is on the table." *Id.* at 3. The other two (2) alternatives presumably were either (1) entering into negotiations with Meridian or (2) not negotiating with Meridian. In his deposition, Shuff stated that he did not believe that the notice of the meeting scheduled for October 7th contained any reference to Mellon. Document 36 of the Record, Tab 61 at 1098b. The court's review of the record does not disclose the contents of the notice given the Board setting up the October 7 meeting. In any event, Mellon apparently was not mentioned in the notice of the October 7th meeting. The following colloquy occurred at Shuff's deposition:

Q. [W]as there a time after the first notice that you gave of the meeting that you gave a second notice of the purpose of the October 7 Monday meeting?

A. I don't believe so.

Q. When did you first give notice that the meeting was not going to be held on October 7 but was to be held on October 8?

A. I believe it was around midnight on Sunday, October 6.

Q. What did you tell the members of the board as to the reasons for the change and/or as to the purpose of the meeting?

A. Again, I don't recall specifically what might have been said in those conversations. Generally that the options and alternatives which I had previously mentioned to them in my phone call were not in a condition to be discussed on Monday, but we believed that they would be in such a condition on Tuesday and that therefore the meeting was postponed from that Monday, October 7 until Tuesday, October 8.

*Id.* at 1098b–1099b. In response to the question of whether Shuff notified the Board prior to their "walking in" to the October 8 meeting that they would be considering a Mellon proposal, he stated "[I] personally did not notify to the best of my recollection any board member that a Mellon proposal or offer would be discussed at the October 8 board meeting." Document 27 of the Record, Tab 72 at 52. In this regard, the deposition testimony provides:

Q. When to your knowledge was the first time that a board member other than the management members that were involved in negotiating the terms of this agreement had access to the agreement itself?

A. To my knowledge, that would have been at or about the commencement of the meeting on October 8.

*Id.*

On Monday, October 7, 1985, Meridian issued a press release that "[i]t [had] terminated and withdrawn its offer for Commonwealth National Financial Corporation...." This was confirmed by letter addressed to the Commonwealth Board. Consequently, at this point, while there was a Board meeting scheduled for October 8th, Meridian had withdrawn its "offer" and no agreement on price had been reached with Mellon. The record discloses that Commonwealth was unsure of Mellon's offering price until Monday evening October 7, 1985. The following discussion occurred at Merrill's deposition:

Q. What time Monday night did you have the price that you felt was what Mellon was going to offer?

A. Seven to 7:15.

Document 36 of the Record, Tab 53 at 940b.

Because Mellon's offering price was not set, F. John Hagele, Esq., counsel for Commonwealth, initiated a telephone call to Meridian's outside counsel, Joseph Harenza, at 8:35 A.M. on October 7th for the purpose of requesting Meridian not to withdraw its "offer" prior to Commonwealth's October 8th meeting. Undoubtedly, the telephone conversations on October 7, 1985, between Hagele and Harenza are a critical element of the instant factual background. In the court's April 7th Memorandum, it was noted that Hagele's deposition testimony was accepted as true because there were no counter affidavits submitted by Harenza. After renewed discovery, plaintiffs have submitted an affidavit of Joseph M. Haren-

za. *See* Document 70 of the Record at Exhibit 1.

In his affidavit, Harenza states that Hagele telephoned him on the morning of October 7, 1985. As Harenza recalls:

> Mr. Hagele telephoned me during the morning of October 7 and said that the purpose of his call was to determine if Meridian had published a withdrawal. In this first telephone conversation with Mr. Hagele on October 7, 1985, I told Mr. Hagele that I was aware that a public announcement indicating withdrawal had been prepared, but I was not yet aware whether it had been publicly released. I said that I would check to see if the withdrawal had been published to the wire services, and that I would communicate the result of my inquiry to him. I then ascertained that Meridian's announcement of its withdrawal had already been publicly released.

*Id.* at ¶ 6. In addition, Harenza avers:

> When I spoke to Mr. Hagele for the second time later that morning, I communicated this fact to him. Mr. Hagele asked if Meridian would consider reinstituting its offer. I asked why Commonwealth had not called me with this request on Friday or over the weekend. Mr. Hagele did not respond to this question. I then advised Mr. Hagele, following my own communications with Mr. McCullough, Meridian's Chief Executive Officer, who was present during this second telephone conversation, that Meridian was willing to reinstate such offer but was concerned about confusing and misleading the investing public by announcing a withdrawal and shortly thereafter a reinstatement without sufficient reason. I then stated that Meridian would publicly reinstate its offer and risk misleading and confusing the investing public only if it had reason to believe that Meridian had a chance to acquire Commonwealth or that Commonwealth would at least talk to Meridian. I then stated more

specifically to Mr. Hagele that Meridian could justify this risk only if either of the following two events occurred: (1) Commonwealth's management agreed to propose Meridian's offer to its Board for approval; or (2) Commonwealth agreed to set a time and place for negotiations with Meridian. I also added that Meridian was prepared to sit down and negotiate, at any time or place (including immediately, if necessary, in Philadelphia or Harrisburg), a possible combination and that Meridian was willing to negotiate any terms of its offer, including price, which Commonwealth's management found not acceptable. *I considered this a reinstitution of the Meridian offer, subject only to some indication that Commonwealth would talk to us. Mr. Hagele advised that he had no Board authority to consent to either of these alternatives, and rejected both of them. I did not advise Mr. Hagele that Meridian would only 'consider' reinstating its $39.00 offer if Commonwealth met one of the above two alternatives or that a management recommendation of the Meridian proposal to the Commonwealth Board was the sole condition to a Meridian reinstatement, with no other alternative.*

*Id.* at ¶ 7 (emphasis added).

The primary difference between Hagele's account of the telephone conversations, *see* Document 51 of the Record at 16–17, and Harenza's version is the fact that Harenza denies modifying the initial conditions to reinstate the "offer."[6] Specifically, as will be discussed *infra*, Harenza denies stating that Meridian would rescind the press release only if Commonwealth immediately committed to recommend Meridian's "offer" to the Board. Significantly, however, Harenza does not deny that Meridian's "offer" was withdrawn. Harenza acknowledges that he considered the Meridian "offer" reinstituted *subject only* to some indication that Commonwealth would agree to

---

**6.** Although not mentioned by Harenza, Hagele avers "[I] advised him (Harenza) that we were having a board meeting at (of) the Commonwealth National board the following morning and that I thought it was in everyone's best

interest if the offer remained outstanding and that no public announcement be made of its withdrawal." Document 37 of the Record, Tab 22 at 207a. Of course, the public withdrawal had already been made.

talk to Meridian. As Hagele advised Harenza, however, he could not agree to commit Commonwealth to negotiations. Document 37 of the Record, Tab 22 at 210a; Document 51 of the Record at 17 n. 15. Hagele testified at his deposition on this point:

Certainly we had no authority to accept the offer and certainly I believed it was in everyone's best interest if we had the Meridian proposal before the board on Tuesday morning. I think technically, of course, we could have sat down and negotiated with Meridian without board authority, but at that point we were not prepared to do so.

Document 37 of the Record, Tab 22 at 210a.

The record demonstrates that Commonwealth, through Hagele, asked that the Meridian offer remain outstanding for the Board's October 8, 1985, meeting. Richard Sapp of Goldman Sachs stated at his deposition, "[s]o, there was a contact made to Meridian to tell them we are considering— we will have a board meeting, we at that time will consider your proposal, please, we would like you not to withdraw it." Document 36 of the Record, Tab 52 at 927b. When questioned about conversations apparently between Merrill, Goldman Sachs and Hagele concerning whether or not a call should be made to Meridian, Sapp stated:

Over the weekend we were very much engaged in discussing the position with Mellon and getting the Mellon work done.

Late on Sunday night we had a discussion that that call should be made because we were very much concerned that Mellon would not be in a position to tell us anything that would be attractive to us, and we therefore took the position that Mellon[7] had an offer that we could talk about with the board, and the board, after knowing what the Meridian offer was and discussing it, knowing what happened at the other bank holding companies in the state, could make a decision to

direct management to take action accordingly.

Document 36 of the Record, Tab 52 at 928b–929b. Admittedly, Harenza neither acknowledges nor denies that Hagele advised him of Commonwealth's desire to present Meridian's proposal to the Board, but in a consolidated statement of facts submitted by plaintiffs, it is acknowledged that Hagele, *inter alia,* requested that the "offer" remain open. *See* Document 42 of the Record at 39.

Commonwealth's Board of Directors met on Tuesday, October 8, 1985 at 8:00 A.M. and proceeded to discuss the Mellon proposal. The Directors were informed that Meridian's "offer" had been withdrawn, but it was recognized that Meridian was still there to talk to. Document 99 of the Record at 8 and 23. The thrust of the meeting, however, was to evaluate and decide on Mellon's existing proposal concerning merger. It appears that the vote approving the merger with Mellon occurred at 9:48 A.M., while adjournment was delayed until approximately 11:00 A.M. *See* Document 51 of the Record at 19 n. 18. The parties have not submitted any further evidence contradicting this assumption. Of course, the directors had met previously on September 18, 1985 and extensively discussed Meridian's September 12th letter.

The Commonwealth Board approved the merger on October 8th as did the Executive Committee of Mellon's Board of Directors on the same morning. Proxy materials were mailed to Commonwealth's shareholders on November 25, 1985. Of seventy percent (70%) of eligible shareholders voting, ninety-four percent (94%) voted in favor of the merger.

## DISCUSSION

Defendants claim that based on the undisputed facts set forth in this court's April 7th Memorandum and Order, they are entitled to judgment as a matter of law. The court's factual findings were based on the record as it then existed, as they must have been for purposes of that Motion for Sum-

---

7. Although Sapp refers to an offer Mellon had, the court believes this to be a misstatement in that it appears that Sapp was discussing Meridian's proposal.

mary Judgment. The court agrees with plaintiffs that additional evidence creating material factual disputes has been presented.

The parties concede that the following legal issues exist: (1) Was the Meridian "offer" a material fact that Commonwealth had to disclose in its proxy statement? and (2) Did the Commonwealth Board of Directors breach its fiduciary duty of care to the shareholders by approving the merger with Mellon? Factually, the principal issues may be categorized as follows: (a) Was the Meridian "offer" withdrawn? Specifically, what effect did the Hagele/Harenza conversation of October 7, 1985 have on the status of the "offer"? (b) Even if the "offer" was withdrawn, was Meridian's existence as a willing suitor ready to negotiate merger, coupled with the fact of past "offers" from Meridian, a material fact requiring disclosure? (c) Did the Board members make an informed business decision? In this regard, to what extent could the Board rely on advice of Goldman Sachs and Commonwealth's management? (d) Did the Board breach its duty to the shareholders by failing to maximize price before granting Mellon a lockup? Specifically, is the Board liable for not attempting to negotiate a higher price with Meridian or Mellon before approving the merger with Mellon? The court finds that sufficient factual disputes exist precluding summary judgment on the above-mentioned legal issues.

## I.

### *Proxy Statement*

The factual disputes concerning the Section 14(a)[8] and Rule 14a–9[9] issues center around the materiality of Meridian's "offers" to merge. In this regard, the court must examine ¶ 23 of defendants' Statement of the Material Facts As to Which There Is No Genuine Issue To Be Tried and ¶ 23 of plaintiffs' Statement in Response to Defendants' Statement of the Material Facts As To Which There Is No Genuine Issue To Be Tried. In defendants' Statement they aver:

On Monday, October 7, 1985, Meridian issued a press release that 'it [had] terminated and withdrawn its offer for Commonwealth National Financial Corporation.' This was confirmed in a telephone conversation between counsel for Meridian and Commonwealth as well as by letter addressed to the Commonwealth Board. After consultation with Goldman Sachs representatives and Shuff and Merrill of Commonwealth, F. John Hagele, Esquire, counsel for Commonwealth, initiated the telephone call to Meridian's outside counsel, Joseph Harenza.

Document 61 of the Record at ¶ 23. Defendants maintain that Hagele advised Harenza that Commonwealth was holding a board meeting the following morning and that it ' "[w]ould be in everyone's best interests if the [Meridian] offer remained outstanding, and that no public announcement be made of its withdrawal." ' *Id.* Defendants then contend that "Harenza responded that he thought it was too late because Meridian had initiated a public release withdrawing the offer and expressed concern about confusing the investment public. He added that he did not know if Meridian would be willing to stop it." *Id.* Defendants aver that Harenza told Hagele,

---

**8.** Section 14(a), 15 U.S.C. § 78n(a), provides: It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78(1) of this title.

**9.** Rule 14a–9, 17 C.F.R. § 240.14a–9(a) provides in part:

No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading....

in a second telephone conversation, "[t]hat the news release withdrawing the offer had already hit the wires but that Meridian would countermand its press release *only if* Commonwealth would accept the September 30th offer or would set a place and time for negotiations." *Id.* (emphasis added).

Plaintiffs' version is as follows:

Harenza advised Commonwealth that the offer would remain open *if Commonwealth's management either would agree to propose the Meridian offer to its board or would set a time and place for negotiations.* This failure to either communicate or negotiate with Meridian was seen by Harenza and Meridian as a continuation of Commonwealth's refusal and rejection of all Meridian offers and Meridian's unwillingness (sic) to discuss and negotiate all aspects of its offer which Commonwealth found unfavorable. *Harenza did not advise Hagele that Meridian would only 'consider' reinstating its $39.00 offer if Commonwealth met one of the above alternatives or that a management recommendation of the Meridian proposal to the Commonwealth Board was the sole condition to a Meridian reinstatement, with no other alternative.*

Document 68 of the Record at ¶ 23 (emphasis added). Accordingly, defendants characterize the conversation as a "take it or leave it" situation. That is, when Commonwealth decided to "leave" Meridian's terms,[10] the "offer" was not reinstated and the withdrawal remained in effect. On the other hand, plaintiffs, in part through Harenza's affidavit, maintain that Merrill and Goldman Sachs "[b]elieved that Meridian's deadline of October 4 had not been real or firm, and that Meridian's offer would be there for several days or a week thereafter." Document 68 of the Record at ¶ 23.

In the court's April 7th opinion, it found that Meridian's "offer" was withdrawn and, thus, disclosure was not necessary. In making this finding, however, the court

recognized that defendants contended that Meridian said it would have to consider whether to reinstate the offer and would withdraw the press release only if Commonwealth immediately committed to recommend Meridian's offer to the Board. Document 51 of the Record at 17. As the court noted:

Harenza advised that the Meridian news release stating that Meridian had withdrawn its $39 per share offer had been made public and, further, that another news release countermanding the withdrawal release would not be issued unless 'either Commonwealth National accepted the offer or Commonwealth National would immediately set a date and place to sit down and enter into negotiations with Meridian.' (citing Document 34 of the Record, Exhibit 4 at 119b–120b). *Specifically, Hagele testified that Harenza then modified this statement and specified that Meridian would 'have to consider whether to reinstate the offer' and would withdraw the press release 'only if [Commonwealth] management would give them immediate assurance that they would recommend the Meridian proposal to the board....'* (citing Hagele Deposition, Document 37 of the Record, Exhibit 22 at 212a–213a).

Document 51 of the Record at 26 (emphasis added). Significantly, the court relied on Hagele's version of what Harenza said because it was then unchallenged. *Id.* at 27.

The affidavit submitted by Harenza indicates no such modification of his original "suggestion." In fact, Harenza states that he did not advise Hagele that a management recommendation of the Meridian proposal to the Commonwealth Board was the sole condition to a Meridian reinstatement. *See supra* at 14. At the same time, however, Harenza refers to "reinstating" the "offer" rather than keeping the "offer" open. *Compare* Document 70 of the Record, Exhibit 1 at ¶ 7 *with* Document 68 of the Record at ¶ 23.

---

**10.** By "terms", the court refers to the two conditions Harenza placed on keeping the Meridian offer open. Namely, Commonwealth's agreeing to propose the Meridian offer to its Board or to set a time and place for negotiations.

As stated, defendants maintain that the "offer" was withdrawn. Document 61 of the Record at ¶ 28. Plaintiffs characterize the "withdrawal" as a "rejection" by Commonwealth of Meridian's "offer." Document 68 of the Record at ¶¶ 27 and 28. While plaintiffs concede that the October 7th telephone conversation between Hagele and Harenza was "[u]nsuccessful in preventing the formal withdrawal of the $39 offer that had already occurred", *see* Document 86 of the Record at 14 and Document 90 of the Record at 3, they contend that the withdrawal was formal only, relying on Hagele's belief that what's on the table at 4 p.m. Friday was on the table again on Monday. Document 86 of the Record at 16. Defendants maintain, however, that a formal withdrawal is a withdrawal nonetheless and that even if the "offers" were not withdrawn, they were only proposals to negotiate that need not be disclosed. Document 61 of the Record at ¶¶ 27 and 28.[11] Plaintiffs contend that "[t]he issue is not whether these were offers or proposals to negotiate, but whether they were so tentative as to not require disclosure." Document 68 of the Record at ¶ 27. The court agrees with defendants that the "offer" was withdrawn. *See* Document 99 of the Record at 30.

As defendants aver, Harenza's affidavit speaks in terms of "reinstating the offer." Meridian's press release and confirmation letter refer to withdrawal of the "offer." Plaintiffs agree that the October 7th telephone conversation between Hagele and Harenza was "[u]nsuccessful in preventing the formal withdrawal of the $39 offer that had already occurred." Document 86 of

the Record at 14. Finally, at oral argument, plaintiffs' counsel conceded that Meridian's "offer," at the very least, had been formally withdrawn on one level. Document 99 of the Record at 30.

Sapp's testimony indicates that Commonwealth wanted Meridian's "offer" kept open so that it could be presented to the Board in the event Mellon had nothing to present. Accordingly, from the record as it presently exists, it appears that Commonwealth would have presented Meridian's proposal to the Board had Meridian reinstated the "offer." As Merrill stated in his deposition:

Q. Did you intend to negotiate with them (Meridian)?

A. If we were unsuccessful in attracting a more attractive offer. We considered it.

Q. The timing of this proposal if followed to the fullest extent would not permit you to negotiate on Monday, October 7th, with Meridian? Isn't that true?

A. I don't know why not.

Q. It says you had to have a definitive agreement signed sealed and approved by the Board and announced as soon as possible Monday morning?

A. What I said was if we did not have an offer from Mellon we still had time to negotiate with Meridian. That was our concern.

Document 34 of the Record, Tab 9 at 235b. Rather than accept Commonwealth's invitation, Meridian insisted on attaching condi-

---

**11.** According to defendants:

[B]oth (Harenza and Hagele) clearly acknowledge that at the time of the pertinent telephone conversation, the formal withdrawal of the Meridian offer had already gone out over the news wire. Hagele Deposition at 65; Harenza Affidavit, ¶ 7. Hagele then inquired as to whether the offer would be reinstated. Hagele Deposition at 65; Harenza Affidavit, ¶ 7. Harenza stated that it would be, if various conditions were met by Commonwealth. Harenza Affidavit, ¶ 7; Hagele Deposition at 65–69. Recollections may differ as to the precise order of the conversation and the precise language of that conversation. Two facts

are clear, however: the public withdrawal of the Meridian offer was never rescinded and, indeed, that public withdrawal was reaffirmed by a letter sent to Commonwealth dated October 7, 1985.
Document 74 of the Record at 11–12.

Nowhere in the Harenza Affidavit is there a direct assertion that the Meridian "offer" remained open. On the contrary, Harenza does refer to reinstating the "offer," thereby indicating that the "offer" had been withdrawn and would be reinstituted only if certain conditions were met. None of these conditions were acceptable to Commonwealth and the "offer" was never reinstated.

tions to the reinstitution of the "offer." [12]

█ In essence, however, plaintiffs' position is that even if the "offer" was withdrawn, it still had to be disclosed in the proxy statement. As plaintiffs aver:

[E]ven if Meridian's offer technically was withdrawn, it would be material to a shareholder seeking to judge the merger market or management's motive in seeking a merger with Mellon. Thus, the Affidavit of James M. Weaver states that, as an investment advisor and analyst, he would consider Meridian's offers material to his investment decisions even if those offers were withdrawn.

Document 69 of the Record at 17. Having determined that Meridian's "offer" was withdrawn formally, *see* Document 51 of the Record at 30, it remains to be seen whether the very existence of the proposals, coupled with the willingness of Meridian to negotiate, can be termed a material fact which the Commonwealth directors had a duty to disclose. The court finds that this question is within the province of a fact finder to decide at trial.[13]

**12.** The following colloquy occurred between the court and plaintiffs' counsel at oral argument as to why Meridian attached conditions to its "offer."

THE COURT: I mean if it was a viable offer that could be accepted, why would you put these further conditions on it? You've got to either recommend our offer, or agree to negotiate. Why wasn't it in such form that it could be accepted right on the spot?

MR. McDANIELS: Well, there is no question, it had been formally withdrawn on one level. But what I think—read Mr. Harenza saying is, he put it back in place. And even more than that, he's still willing to negotiate every term.

He wants not only to have an offer there, but he wants to win. And he may be concerned that some other offer is going to be there, although he wasn't made privy to any other offer. So he wanted not only to have an offer there, but he wanted to have his best offer there. He hadn't made his best offer.

THE COURT: He didn't say that, did he?

MR. McDANIELS: Yes, he did. He said—

THE COURT: I thought he said, 'We'll agree to withdraw the public announcement and reinstate the offer if you agree to either recommend it, or you agree to enter into negotiations.'

MR. McDANIELS: That's correct.

THE COURT: Now, why couldn't he have said, the offer is still open. You can accept it if you want. If you don't want to accept it, listen, we're still willing to negotiate.

MR. McDANIELS: I think because Mr. Harenza wanted to win. He didn't want just to have a $39.00 offer on the table, if it would take more than a $39.00 offer to win.

THE COURT: But he didn't know about Mellon Bank?

MR. McDANIELS: No, but he had to sense something was going on, because now they're calling me. They didn't call me on Friday, now they want me to hold this open. And he wanted to win. He wanted either to have a recommendation that you will accept my offer, or let me negotiate it. Tell me what's wrong with it and I'll negotiate any term of it.

He didn't want to be set up, so that all that went to the Board meeting was a $39.00 offer from him, and a $40.00 offer from Mellon wins.

. . .

THE COURT: He just asked, would you keep that offer open?

MR. McDANIELS: And he said, I will, if you'll recommend it, or if you sit down and negotiate.

THE COURT: But what would have prevented him from saying, after he had consulted with Mr. McCullough, yes, we will keep it open. And, further, we're willing to negotiate beyond that.

MR. McDANIELS: Your Honor, I'll answer it this way if I may. The documents show clearly that Commonwealth did not want a higher Meridian offer. It shows clearly that they were afraid they were going to scare away their preferred White Knight.

And I suggest to you that Mr. Harenza realized that he either wanted to be told that this number was going to be recommended, that is, this number will do it, or give me the chance to improve on it, which is what I'm willing to do, negotiate any term of it.

And that is precisely what Commonwealth refused to do. And the documents make clear. The answer to your question, 'Why didn't he go back to Meridian', was, they did not want to scare anyone else away.

They had sat down and made a deliberate decision that we don't want the Meridian offer to go up; it might scare people away; even though they had predicted—

. . . .

Document 99 of the Record at 30–32. Accordingly, it was Meridian's decision to couch their proposal in conditional terms.

**13.** The proxy material in question contains the following statement:

After another Pennsylvania bank holding company, on September 19, 1985, made a public proposal to negotiate the purchase of all of the outstanding shares of Commonwealth Common Stock, Mellon again approached Commonwealth with an expression of interest.

Accordingly, the fact finder must decide if this statement adequately discloses Meridian's proposals.

As two (2) commentators noted more than ten (10) years ago, "[t]he cases increasingly suggest that not merely firm offers but other possibilities which have some minimum probability of realization must be disclosed and explained in the material which solicits mergers or recapitalizations." Brudney & Chirelstein, *Fair Shares in Corporate Mergers and Takeovers*, 88 Harv.L.Rev. 297, 302 n. 12 (1974) (citations omitted). For example, in *Levin v. Marder*, 343 F.Supp. 1050 (W.D.Pa.1972), Judge Teitelbaum held that a question of fact existed concerning whether a failure to disclose a "preliminary proposal" was material and might be relied on by plaintiff, thereby precluding summary judgment. While *Levin* concerned § 10(b) of the Securities Act, the same general principles apply to a determination of materiality in this case as well. *See also Wetter v. Caesars World, Inc.*, 541 F.Supp. 68 (D.N.J.1982) (if offer is found to be a reasonably realistic proposal, failure to mention such offer in proxy statement would be a material omission because such an offer could be of importance to a shareholder when deciding how to vote).

In essence, while the court realizes that in some cases disclosure of proposals, withdrawn offers or mere possibilities concerning alternative plans may not be necessary in view of the uncertainty of the terms of the alternate possibilities and, in fact, could be misleading itself, *see* Brudney & Chirelstein, *supra*, at 302 n. 12, in this case, the question is for the fact finder to answer. In *Umbriac v. Kaiser*, 467 F.Supp. 548 (D.Nev.1979), the court discussed disclosure under Rule 14a–9 and stated "[a]s a mixed question of law and fact, the materiality of an omission or misrepresentation rarely is the proper subject for summary adjudication." *Id.* at 553. The court finds that the present case is not such a rare situation. In *Umbriac*, the possibility that the shareholders would have used certain facts to defeat a liquidation was sufficient to raise the spectre of materiality, *id.* at 555, although the court granted defendants' motions for summary judgment when plaintiff failed to provide any proof of actual damages. *Id.* at 555–56. As the United States Supreme Court held:

> The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, (footnote omitted) we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, *and these assessments are peculiarly ones for the trier of fact.* (footnote omitted).

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976) (emphasis added); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987).

This court noted in the previous Memorandum that the majority of the objective facts in this case were undisputed.[14] The

---

**14.** At oral argument, the following colloquy occurred between the court and plaintiffs' counsel:

THE COURT: Before you start, I don't want to knock you off balance. But in my Memo of April 7th, what statements that I accepted as fact would you contend now are inaccurate or are subject to challenge?

MR. McDANIELS: Well, what really we have here, your Honor, are three categories of evidence that has developed since the time of your previous ruling on Summary Judgment.

One, are the documents that now, record meetings, that were not available to us before.

Number two, would be the Affidavits of two experts opining as to the worth of the $39.00 Meridian offer, and comparing it favorably to a $40.00 Mellon offer.

And the third item is the Harenza Affidavit, particularly Paragraph 7 of that affidavit, that directly contradicts Mr. Hagele's version of the conversation, at least in its most important respect that your Honor cited in the previous memorandum.

And if I may I'm going to concentrate, whatever question your Honor has, but I'd like to concentrate on two of these: the documents and the Hagele Affidavit, if I may.
. . .
MR. McDANIELS: I'm sorry, the Harenza affidavit.

inferences drawn from these facts, however, are disputed so that reasonable minds may differ on the question of materiality. *Id.*[15]

This court held in ruling on plaintiffs' Motion for Summary Judgment that the "offer" was clearly withdrawn, and disclosure was not necessary. In so doing, the court relied, in part, on the Ninth Circuit Court of Appeals' holding that there is no duty to disclose inquiries or indications of interest that do not fall within the category of firm or definite offers. *See* Document 51 of the Record at 23 (citing *South Coast Servs. Corp. v. Santa Ana Valley Irrigation Co.*, 669 F.2d 1265 (9th Cir.1982)). Indeed, in *Elgin Nat'l Indus., Inc. v. Chemetron Corp.*, 299 F.Supp. 367 (D.Del. 1969), the court found that the failure to disclose numerous casual inquiries in a proxy statement did not constitute a violation of Rule 14a–9. *Id.* at 371. The *Elgin* court noted:

> To make public every 'casual' approach looking toward the joinder of two companies would in many instances be disconcerting to stockholders, occasion innumerable inquiries concerning the terms, the extent of the discussion, possibility of consummation and the like, and, perhaps play an important part in unfortunate gyrations of the market price of the stock.

*Id. See Allen v. Penn Central Co.*, 350 F.Supp. 697, 703 (E.D.Pa.1972) (drafters of proxy statement have no obligation to discuss every conceivable alternative to the course of action for which management seeks shareholder approval). This court employed the same rationale in reaching its

decision. Document 51 of the Record at 28.

As stated, however, this reasoning applies to casual inquiries or indications of interest, but not to situations where the interested party has manifested a definite willingness to proceed with serious negotiations and, in fact, has made price proposals to merge. In this case, based on the expanded record, the fact finder may conclude that Meridian's proposals were material matters which Commonwealth's shareholders would regard as significant and, perhaps, influence their decision on the Mellon offer, despite the withdrawal of the Meridian "offer." Specifically, sufficient factual disputes exist concerning this issue.

In reaching the decision that casual inquiries need not be disclosed on plaintiff's Motion for a Preliminary Injunction, the *Elgin* court opined that facts may be developed at final hearing which would warrant a different result. Similarly, in *South Coast Servs.*, the "other inquiries" consisted of a single telephone call to the Board of Directors of the defendant corporation during their meeting considering a one day offer to merge from another corporation. *Id.* at 1273. While such last minute expressions of interest do not constitute the type of firm offer that must be disclosed, the facts in the present case reveal a different scenario.

Meridian's proposals to Commonwealth existed for at least one month prior to the Board's October 8th meeting. Moreover, Meridian submitted a specific proposal for Commonwealth's consideration with the comment that all terms were subject to negotiation. Meridian's continued interest in Commonwealth and the repeated propos-

---

Document 99 of the Record at 26–27. The court has discussed the effect of the Harenza affidavit in this Memorandum. The two (2) remaining categories of new evidence will be referred to further in this Memorandum.

**15.** One such example of differing inferences that can be drawn from the same objective fact should suffice. Certain notes of Attorney Hagele, taken at the October 8th Board meeting, state:

> —Withdrawn, although aware of board meeting

> —'assurances' that they are still there

—no effort on their part to raise offer
Document 86 of the Record at 16; Document 87 of the Record, Tab 31 at # 80042. Plaintiffs argue that this indicates that the Meridian "offer" was regarded by Commonwealth as being open. On the other hand, defendants maintain that Hagele was referring to Meridian still being there, not the "offer." Document 90 of the Record at 4. Although the court has found that the "offer" was withdrawn, pursuant to *TSC Indus., Inc.*, the meaning of these entries and their materiality to the issues in this case are for the fact finder.

als to merge may be construed as more than casual inquiries.

The issue then becomes whether a withdrawn offer can ever be material. In this case, the Meridian "offer" was withdrawn when Commonwealth failed to agree to "sit down" and negotiate with Meridian. Plaintiffs specifically deny that Meridian "demanded" that Commonwealth's management commit itself immediately to recommend the Meridian proposal to Commonwealth's Board before Meridian would reinstate the offer. *Compare* Document 51 of the Record at 28–29. In any event, it must be determined if summary judgment is proper in the context of this case and under the standard enunciated in *TSC Indus., Inc., supra.* "Only if the alleged misrepresentations or omissions are so clearly unimportant to an investment decision that reasonable minds cannot differ should the issue of materiality appropriately be resolved as a matter of law by summary judgment or a motion to dismiss." *Berg v. First Am. Bankshares, Inc.,* 796 F.2d 489, 495 (D.C. Cir.1986).

Determination of this issue hinges on whether a withdrawn offer is comparable to preliminary merger discussion or a definite proposal. *See, e.g., Greenfield v. Heublein, Inc.,* 742 F.2d 751 (3d Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985) (in § 10(b) and § 14(e) action, preliminary merger discussions need not be disclosed, but where an agreement in principle to merge is reached, the duty of disclosure arises). In *Alameda Oil Co. v. Ideal Basic Indus., Inc.,* 337 F.Supp. 194 (D.Colo.1972), the court found that only real or solid *outstanding* merger offers need be disclosed. *Id.* at 195. While the Meridian "offer" was withdrawn, the court finds that the background of Meridian's "pursuit" of Commonwealth, coupled with the willingness to negotiate, despite the withdrawn "offer", are sufficient to cause reasonable minds to differ over the materiality of this information.

Although not determining the question of materiality of omissions concerning firm offers, the court in *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281 (2d Cir.1973), recognized precedent that management, when endorsing one offer, must inform stockholders of any better ones. *Id.* at 1295. As the court stated:

> And we have very recently held that failure by the maker of a tender offer of its securities to disclose serious and active negotiations to sell a significant asset substantially below book value violated § 14(e) (citation omitted). We see no significant difference between this and a failure to include the receipt of offers well in excess of book value in a proxy statement seeking approval of a merger, provided that the omission was material.

*Id.*

▮▮▮ Thus, the court cannot find as a matter of law that Meridian's proposal, though formally withdrawn, was not a material fact that needed to be disclosed. *See Texas Partners v. Conrock Co.,* 685 F.2d 1116 (9th Cir.1982), *cert. dismissed,* 460 U.S. 1029, 103 S.Ct. 1281, 75 L.Ed.2d 501 (1983). That is, the fact finder must decide whether, under all the circumstances, Meridian's position as outlined was a sufficiently firm proposal reasonably available to Commonwealth so that disclosure of its existence to the shareholders was required. While it may be that Meridian's proposal was not definite enough as to price or structure, it may have assumed importance to a shareholder and adequate evidence has been presented to warrant submission of this issue to the fact finder.[16] Accordingly, summary judgment on this issue will not be granted.[17]

---

**16.** In its April 7th Memorandum, the court noted that the record did not support plaintiffs' position that the Meridian proposal was more favorable than the Mellon offer. Document 51 of the Record at 23 n. 21. Of course, the court made this observation based on the then present record, without benefit of such information as the Weaver and Vora affidavits since submitted by plaintiffs. Document 70 of the Record at Exhibits 2 and 3.

**17.** The court will deny defendants' motion as it pertains to plaintiffs' § 10(b) claims. Defendants attempt to demonstrate that § 10(b) has no applicability to the named plaintiffs in this case. *See* Document 99 of the Record at 4. An exchange of stock pursuant to a merger, however,

## II.

### Breach of Fiduciary Duty

As to the second issue, plaintiffs contend that additional documentation which was not available to them or the court earlier reveals a course of conduct demonstrating that the Board breached its fiduciary duty to its shareholders under state law when it knowingly sacrificed dollars for social issues, refused to hold an auction after the company was in play,[18] stonewalled a willing bidder and finally eliminated that bidder with a lock-up for insufficient consideration. *See* Document 86 of the Record at 15. Plaintiffs contend that the directors believed that Commonwealth was clearly for sale and that they then made a deliberate decision not to maximize price despite the existence of two willing suitors. Thus, according to plaintiffs, the lock-up precluded competition before it could begin, at a price below Commonwealth's value and significantly below its predicted value at auction. Plaintiffs aver that once a Board decides it must sell, it has a duty to conduct an auction to obtain the maximum price for its shareholders. Document 86 of the Record at 18 (citing *Edelman v. Fruehauf Corp.*, 798 F.2d 882 (6th Cir.1986);

*Hanson Trust PLC, HSCM v. ML SCM Acquisition, Inc., ML L.B.O.*, 781 F.2d 264 (2d Cir.1986); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986)). *See also* Marcotte, *Corporate Raiders Get Ally in Courts?*, 73 A.B.A.J. 26 (January 1, 1987) (outlining *Edelman* and *Revlon;* noting that Pennsylvania law allows directors to consider constituents other than stockholders).

As a court sitting in diversity on this issue, the law of the forum must be applied. In discussing the standard to be applied in cases when "business" decisions of a board of directors are challenged, the Pennsylvania Supreme Court stated "[w]hether the duty of care has been met is a question of fact to be determined by an examination of all the circumstances in the case." *Wolf v. Fried*, 473 Pa. 26, 30, 373 A.2d 734, 735 (1977) (citation omitted). Indeed, these issues have been decided on a case-by-case basis, depending on the different factual settings presented to the court. Annot., 46 A.L.R. 4th 887 (1986). As summarized in a recent annotation:

> Relevant cases suggest that breach of the duty is more likely to be found where corporate directors failed to obtain infor-

---

may qualify as a purchase for purposes of § 10(b). *See Richardson v. Hamilton Int'l Corp.*, 62 F.R.D. 413, 418 (E.D.Pa.1974). In *Richardson,* the court held that a transfer of shares of stock as part of a merger constitutes a sale and purchase of stock within the meaning of § 10(b). *Id.; Goldstein v. Regal Crest Inc.*, 59 F.R.D. 396 (E.D.Pa.1973) (merger is a purchase and sale of stock for § 10(b) purposes). The parties have not addressed this issue in detail. In any event, whether there were material misstatements and omissions in connection with Mellon's acquisition of all the shares of Commonwealth is factually disputed.

Concerning the Rule 14a–9 claims as to other alleged inadequacies in the proxy material, namely, inappropriate background of the Mellon merger and failure to reveal conflicts of interest, plaintiffs point to no evidence tending to create material fact disputes concerning the purported misrepresentations of the background of the Mellon merger or the disclosure of Commonwealth's directors alleged conflict of interest in the proxy material. The court specifically discussed and rejected these contentions in its April 7, 1986 Memorandum. *See* Document 51 of the Record at 30–33.

First, in the April 7 Memorandum, the court noted that plaintiffs' contended that the proxy

statement implied that Mellon had a long standing interest in merging with Commonwealth when, in fact, the merger was negotiated at Commonwealth's request over a weekend. *Id.* at 31. The court found that Mellon explored the possibility of merger with Commonwealth as early as Spring, 1983. *Id.* This supported the "long standing" interest statement in the proxy material. *Id.* As to the other alleged misstatements regarding the background of the Mellon merger, the court held that assuming *arguendo* such statements were misleading, they did not concern facts material to a shareholders' decision. *Id.* at 31–32.

Secondly, plaintiffs' alleged that the proxy material failed to disclose that Mellon promised that the Commonwealth Board would remain in place and that Merrill could offer three (3) year employment contracts to up to six (6) Commonwealth executives. The court noted that serious conflicts of interest had to be disclosed in proxy material, but found that plaintiffs failed to show that these facts amounted to a conflict of interest requiring disclosure. *Id.* at 32–33.

**18.** Apparently, the phrase "in play" refers to plaintiffs' position that Commonwealth was up for sale.

mation that was material and available, in the form of the documents setting forth the transaction's terms, consultation with the corporation's management, advice from outside experts such as attorneys and investment banking firms, or otherwise. The amount of information necessary seems to depend upon the factual setting involved and the amount of training, experience, and sophistication which the directors have, though one should note that the latter factors may not preclude altogether the need for at least some degree of information beyond general sophistication and applicable to the particular transaction at hand. The amount of time required to be spent by the directors in considering the information also appears to be situation specific, with the courts seemingly less willing to accept decisions made on short notice, in haste, or within an unreasonably short timespan, unless appropriate emergency circumstances were demonstrated. (citation omitted).

As might be deduced from the foregoing, the courts appear more willing to find fulfillment of corporate directors' duty to be informed in a merger or tender offer context, thus providing the directors with the protections of the business judgment rule, when the record has shown that they hired expert advisers to obtain information for them or obtained information themselves, considered a range of available strategies, studied more than one prospective merger partner or tender offeror, or otherwise took into account factors which reflected the best interests of the corporation and its stockholders. Further, courts appear to

have reacted more favorably to corporate boards who allowed themselves a reasonable amount of time to study and consider the information made available to them through any or all of these sources. (citation omitted).

*Id.* at 891.

As plaintiffs frame the issue, the fact finder should determine whether the directors exercised sound judgment in the shareholders' interest or whether their actions were imprudent so that millions of shareholders' dollars were sacrificed for comfort on social issues. Document 86 of the Record at 19. Defendants, on the other hand, maintain that the directors are presumed to have acted in good faith pursuant to the business judgment rule absent evidence of fraud, bad faith or self interest. In essence, then, plaintiffs contend that negligence on the part of the Board of Directors is sufficient to warrant liability, while defendants aver that plaintiffs must establish fraud, bad faith or self interest on the directors' part.[19]

In Pennsylvania, the duty of care owed by directors and officers of a corporation has been codified. Section 1408 of the Business Corporation Law provides:

A. Officers and directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge the duties of their respective positions in good faith and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances.

15 Pa.Stat.Ann. § 1408(A) (Purdon Supp. 1986).[20] Defendants apparently maintain

---

**19.** Plaintiffs alleged in their complaint that defendants acted with wrongful purpose. In its prior ruling, *see* Document 51 of the Record at 32, the court found no evidence supporting this allegation. Plaintiffs submit additional evidence to support this contention. For example, although a press release was issued on October 1, 1985, expressing Commonwealth's interest in remaining independent, the record reveals that Goldman Sachs asked Mellon if it would consider an up front merger on the same day. *See supra* at 242–243.

**20.** As recognized in a prior Order, the statutory section applicable in this case concerning di-

rector's liability was repealed on November 28, 1986, effective January 28, 1987, by the Directors' Liability Act (DLA), 42 Pa.Cons.Stat. Ann. §§ 8361–8367 (Purdon Supp.1987). This case, however, is governed by § 1408(A). *See* Document 102 of the Record at 6–7 n. 3. Under the DLA, unlik₋ § 1408(A), the bylaws of a corporation may provide that a director is not liable unless the fiduciary duty has been breached *and* the breach constitutes self-dealing, willful misconduct or recklessness. *See* 42 Pa.Cons. Stat.Ann. § 8364 (Purdon Supp.1987). Thus, pursuant to the DLA, if the appropriate resolution is adopted by the corporation, ordinary

that notwithstanding this statutory duty of care, the court must apply the business judgment rule in evaluating the Board's decision in this case. As defendants previously stated in response to plaintiffs' motion for summary judgment, "[f]or plaintiffs to be entitled to relief, they must first show that the business judgment rule does not apply by establishing that ... the Commonwealth directors acted fraudulently, in bad faith or solely or primarily to retain control of the corporation...." Document 31 of the Record at 90–91. Conversely, plaintiffs aver that defendants' position attempts:

> [T]o read the fiduciary duty of care—the obligation to discharge the duties of directors with 'diligence, care and skill'— out of the statute by proposing a version of the business judgment rule that would insulate directors' actions from challenge absent proof that they acted fraudulently, in bad faith or out of self-interest.

Document 41 of the Record at 22–23.

■ In *Wolf v. Fried, supra,* the Pennsylvania Supreme Court, referring to a previous holding in *Selheimer v. Manganese Corp.,* 423 Pa. 563, 224 A.2d 634 (1966), stated:

> We held that even in the absence of fraud, self-dealing, or proof of personal profit or wanton acts of omission or commission, the directors of a corporation may be held personally liable where they have been imprudent, wasteful, careless and negligent and such actions have resulted in corporate losses. Although this Court noted that 'courts are reluctant to interfere in the internal management of

corporations,' we recognize that the 'personal affairs rule' standard of section 408 imposed a higher duty of care on corporate fiduciaries than the common law. (citation omitted).

*Id.* 473 Pa. at 29–30, 373 A.2d at 735. This quotation indicates that pursuant to the Business Corporation Law, directors can be held liable for imprudence, wastefulness, carelessness and negligence.[21] In enacting the Directors Liability Act (DLA), effective January 28, 1987, which repealed § 1408(A), an observation was made during debate in the Pennsylvania General Assembly that the DLA imposed a lesser standard of care than the since repealed § 1408(A). Commonwealth of Pennsylvania Legislative Journal, House of Representatives, October 7, 1986 at 2033 (Remarks of Mr. Manderino). In fact, the following colloquy took place:

> Mr. O'Donnell: [C]ould you tell me what facts would currently yield liability which would be excluded from liability under HB 2072 (DLA)?
>
> Mr. Ryan: As amended, with the passage of the appropriate resolution, ordinary negligence would be excluded from liability, personal liability of the individual director.

*Id.* at 2051. These remarks reinforce the finding that negligence would have been sufficient to impose liability on corporate fiduciaries under § 1408(A), while the DLA provides that negligence may be eliminated as a ground for liability by appropriate corporate action.

In *Enterra Corp. v. SGS Assocs.,* 600 F.Supp. 678 (E.D.Pa.1985), Judge Broderick

---

negligence would not subject a director to liability.

**21.** The *Wolf* court recognized that the statutory section relied on by the *Selheimer* court was amended subsequent to the decision in *Selheimer.* *Id.* at 29 n. 5, 373 A.2d at 735 n. 5. Specifically, § 408 as relied on in *Selheimer* stated:

> Officers and directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge the duties of their respective positions in good faith and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances *in their personal business affairs.*

*Id.* at 29, 373 A.2d at 735 (emphasis added). This statutory section was amended in 1968, after *Selheimer* was decided, and the phrase "in their personal business affairs" was deleted. *Id.* The *Wolf* court applied the pre–1968 version of § 408 because the acts complained of in that case occurred prior to the amendment. *Id.*

In utilizing the pre-amendment version of § 408, the *Wolf* court noted that the so-called "personal affairs rule", in place prior to 1968, imposed a higher duty of care on corporate fiduciaries than the common law. *Id.* at 29–30, 373 A.2d at 735. Section 1408(A), applicable in this case, is the same as § 408 after its 1968 amendment.

relied on the statutory standard of care applicable to officers and directors of a corporation in Pennsylvania and recognized the axiom that " '[c]ourts are reluctant to interfere in the internal management of a corporation' at the behest of a shareholder, *Wolf v. Fried*, 473 Pa. at 29, 373 A.2d at 734, and that '[shareholders] cannot secure the aid of a court to correct ... mistakes of judgment on the part of the [directors].' " *Id.* at 685 (citation omitted). Specifically, the court held "[i]n discharging their fiduciary duties to the corporation, the directors are protected against unwarranted interference from complaining shareholders by the 'business judgment rule.' " *Id.* As Judge Broderick stated "[t]he business judgment rule provides that directors are not liable to the corporation for mistakes in judgment, whether those mistakes are characterized as mistakes of fact or mistakes of law." *Id.* Apparently, the court applied the business judgment rule in evaluating plaintiffs' claims despite the "ordinarily prudent person" standard set forth in the Pennsylvania statute.[22] Concededly, an apparent inconsistency exists between the statutory standard of care mandated by § 1408(A) and application of the business judgment rule. That is, § 1408(A) sets forth the usual "reasonable person" standard of care, while the business judgment rule protects directors from liability for mistakes in judgment, which may constitute a lack of reasonable care.

In *Otis & Co. v. Pennsylvania R.R. Co.*, 61 F.Supp. 905 (E.D.Pa.1945), *aff'd per curiam*, 155 F.2d 522 (3d Cir.1946), the court attempted to harmonize the pre–1968 Pennsylvania statutory standard of care and the business judgment rule. After citing § 408 of the Business Corporation Law, the court, citing New York law, held:

'The question is frequently asked, how does the operation of the so-called "business judgment rule" tie in with the concept of negligence? There is no conflict between the two. When the courts say that they will not interfere in matters of business judgment it is presupposed that judgment—reasonable diligence—has in fact been exercised. A director cannot close his eyes to what is going on about him in the conduct of the business of the corporation and have it said that he is exercising business judgment. Courts have properly decided to give directors a wide latitude in the management of the affairs of a corporation provided always that judgment, and that means an honest, unbiased judgment, is reasonably exercised by them.'

In view of the Pennsylvania statute it seems that the application of this theory is warranted in the instant case.

*Id.* at 911; *see also Nanfito v. Tekseed Hybrid Co.*, 341 F.Supp. 240 (D.Neb.1972), *aff'd*, 473 F.2d 537 (8th Cir.1973) (business judgment rule involves the exercise of due care and compliance with applicable fiduciary duties; directors and officers may be

---

**22.** The business judgment rule evolved to protect management and directors from liability for board action. *See* Leavell, *Corporate Social Reform, The Business Judgment Rule and Other Considerations*, 20 Ga.L.Rev. 565 (1986). The rule, as a defense, is an inroad upon the principle of liability for director misfeasance. *Id.* at 603. One objective of the business judgment rule is to keep courts out of a role they are ill-equipped to perform, namely, injecting the courts into the role of management. *Weiss v. Temporary Inv. Fund, Inc.*, 692 F.2d 928, 941 (3d Cir.1982), *vacated on other grounds*, 465 U.S. 1001, 104 S.Ct. 989, 79 L.Ed.2d 224 (1984). A second purpose behind the rule is to encourage others to assume entrepreneurial and risk-taking activities by protecting them against personal liability when they have performed in good faith and with due care, however unfortunate the consequence. *Id.*

Our Court of Appeals recognized that the business judgment rule assumes different shapes in different settings. *Id. See* Leavell, *supra*, at 601–02 n. 163. The rule protects directors from personal liability for business decisions by presuming that they acted in good faith and with reasonable care. *See Weiss v. Temporary Inv. Fund, Inc., supra; Cramer v. General Tel. & Elec. Corp.*, 582 F.2d 259, 274 (3d Cir.1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979). Significantly, neither *Weiss* nor *Cramer* construed Pennsylvania law in generally discussing the business judgment rule. As set forth, however, the business judgment rule assumes that directors acted in good faith and with due care. Moreover, the presumption of good faith and reasonable care may be overcome by evidence to the contrary.

liable for negligence, but they are not generally liable for errors of judgment or mistakes while acting with reasonable skill and prudence).

■ Thus, the court finds that the Board had a fiduciary duty to exercise due care in ultimately approving the Mellon merger. "A court may not, at the request of a dissatisfied shareholder, substitute its judgment for that of management *unless management has in some way breached its fiduciary duty to the corporation.* (citations omitted) (emphasis added). This is especially true where, as here, management's decision has been ratified by a majority of the shareholders." *Allen v. Penn Central Co.*, 350 F.Supp. 697, 706 (E.D.Pa. 1972); *Evans v. Armour & Co.*, 241 F.Supp. 705 (E.D.Pa.1965). *See also Palumbo v. Deposit Bank*, 758 F.2d 113 (3d Cir.1985) (minority shareholders may not substitute their judgment for that of the directors and shareholders unless they meet a heavy burden of proving fraud, waste or overreaching). In *Palumbo*, plaintiff sought to prevent a merger between Deposit Bank and First Commonwealth Financial Corporation which he believed to be disadvantageous to Deposit Bank. Our Court of Appeals recognized that plaintiff argued *only* that he believed the proposed merger was not the most favorable merger possible, and that he had better ideas. While these allegations alone were held insufficient to impeach the good faith judgment of the directors as to the propriety of the merger, the background of this case is distinguishable. Plaintiffs aver more than the fact that the Mellon offer was not the most favorable available.

Evidence is presented which plaintiffs argue demonstrates that the Board's decisions were made without the requisite care, diligence and skill so that the business judgment rule does not protect the Board from liability. The court finds that application of the business judgment rule does not alter the statutory requirement in Pennsylvania that directors or officers act with reasonable care so that they may be held liable for negligence. Consequently, plaintiffs averments that the Board breached its fiduciary duty by failing to make an informed business judgment and by failing to obtain the maximum price for Commonwealth must be examined to determine if, on the basis of the present motion, material factual disputes exist regarding this issue.

■ As recognized, the Pennsylvania Supreme Court has said that whether the standard of care applicable to directors has been met is a question of fact. Defendants concede that the issue is proper for summary judgment only if there is no evidence to the contrary. Notably, defendants averred at oral argument:

> The Court: Who makes that determination?
>
> Mr. Baughman: If there is *no evidence of negligence,* it's a matter of Summary Judgment. . . .

Document 99 of the Record at 16 (emphasis added). The court holds that on the basis of the record as it now exists, *see infra* at 259–266, the fact finder must decide if the Board breached its fiduciary duty of care in failing to adequately inform themselves or in failing to maximize price as required. That is, the trier of fact will determine whether plaintiffs have proven that the Board failed to act with such care as ordinarily prudent men would have utilized under similar circumstances in approving the Mellon merger. While the Board may be presumed to have acted in good faith and with due care, the fact finder may determine that plaintiffs present sufficient evidence to overcome this presumption.

In its April 7th Memorandum, the court found no evidence that the directors were imprudent, wasteful, careless or negligent. Plaintiffs are now attempting to establish that the directors failed to make an informed business decision and that the directors sacrificed price for, *inter alia,* social issues in violation of the fiduciary duty owed to the shareholders.[23]

---

**23.** While it is not entirely clear exactly what the social issues are, they apparently relate to contracts for senior management, employee situations and community type issues. Document 99 of the Record at 17.

In *Cramer v. General Tel. & Elec. Corp.*, *supra*, our Court of Appeals held "[u]nderlying the [business judgment] rule is the assumption that *reasonable diligence* has been used in reaching the decision which the rule is invoked to justify." *Id.* at 275 n. 20 (citation omitted) (emphasis in original); *see also* Leavell, *supra*, at 601–02 n. 163 (recognizing authority requiring that directors be "informed" before acting). Plaintiffs present Shuff's notes, taken during an Executive Committee meeting of Commonwealth, which indicate that on September 26, 1985, Goldman Sachs, in "[k]icking numbers around, felt that $42 to $45 now is franchise value." Document 87 of the Record, Tab 13 at # 100241. Likewise, Shuff's notes of October 2, 1985,[24] indicate that Goldman Sachs felt that Meridian could pay $1 or $2 more and may keep going but with "heavy justification." *Id.* at Tab 16, # 100260. Indeed, these same notes reflect Goldman Sachs' belief that Meridian could go to $42 or $43, with a sacrifice on social issues and $50 was a possibility, with tremendous pressure. *Id.* at # 100261; Document 99 of the Record at 33–34. Plaintiffs aver that the Board was unaware of Goldman Sachs' higher valuation of Commonwealth and Meridian's willingness to increase its bid thereby illustrating the Board's failure to make an informed decision. It is not clear if the Board was advised of Commonwealth's $42 to $45 potential value as seen by Goldman Sachs.

As to Meridian's willingness to increase its bid, the record discloses that the Board was familiar with the terms and conditions of Meridian's merger proposals as they existed prior to October 8, 1985. *See* Document 51 of the Record at 40–41. The Executive Committee of Commonwealth's Board met for four (4) hours on September 17, 1985, to consider Meridian's proposals. Goldman Sachs presented an extensive analysis, *see* Document 26 of the Record,

Tab 42, and the Executive Committee resolved against negotiations with Meridian. Among those present at this meeting were Board members Aldinger, Alexander, Biechler, McCarty, Merrill, Schwab and Shenk. *Id.* at Tab 43, Commonwealth National Financial Corporation Special Executive Committee Meeting Minutes September 17, 1985. According to the minutes, extensive discussion between committee members and consultants followed Goldman Sachs' presentation.

On September 18, 1985, the Commonwealth Board of Directors met to consider Meridian's proposal. According to the minutes of the meeting, *id.* at Tab 45, Commonwealth National Financial Corporation and the Commonwealth National Bank Joint Board Meeting Minutes September 18, 1985, all Board members were present except Jack P. Cook.

Merrill presented background information on his contacts with Meridian. The presentation was turned over to Goldman Sachs to report on events occurring after receipt of Meridian's letter of September 12, 1985. Each member received a copy of Goldman Sachs' analysis dated September 18, 1985. Document 26 of the Record, Tab 42. The meeting lasted approximately five and one-half (5½) hours, although other matters were discussed. Thus, the record indicates that the Board was acquainted with Meridian's then existing proposals and it is inappropriate to focus only on the October 8th Board meeting when considering the Board's knowledge of Meridian's position. The Board's awareness of Meridian's willingness and/or ability to increase its offer, however, is disputed.

The Board was told on October 8th that Meridian's "offer" was withdrawn, but that Meridian was still there to go and talk to. Document 99 of the Record at 8 and 23. Whether the Board was informed that

---

**24.** The record reflects that on October 2nd, Merrill and John R. Biechler (Biechler) of the Board of Directors met with Commonwealth's legal and financial advisors. Of course, the factual determination concerning the meaning of Goldman Sachs' "kicking numbers around" is for the fact finder. Defendants characterize the October 2nd meeting as a "brainstorming session in which all possibilities and avenues open were being explored." Document 109 of the Record, Tab 10 at 174. The fact remains that the scenario of Meridian paying $42 or $43 a share, with $50 a possibility, was raised by Goldman Sachs.

"talking" to Meridian could yield a price higher than $39 is not clear. Sapp stated at his deposition that the Board was told that Meridian withdrew their offer, but "we", presumably meaning Goldman Sachs and/or Commonwealth's management, "[t]hink it's available to you if you want to pursue this. They haven't disappeared." Document 37 of the Record, Tab 9 at 103a–104a. Moreover, the following colloquy occurred at the deposition:

Q. Did anyone ask you whether it was your opinion that they (Meridian) would go higher?

A. I can't recall.

*Id.* at 104a.

Defendants aver that as early as September 18, 1985, the Board was advised that Meridian was close to being maxed out at $38 a share. Document 97 of the Record at 33. The following discussion transpired at one (1) Board member's deposition:

Q Were you ever given any advice as a board member as to what dollar value Goldman Sachs believed Meridian could offer in a contest for Commonwealth?

A My recollection is that it was—they were very close to being maxed out at $38.00 a share.

Q Based on a statement made to you by Goldman Sachs?

A Yes.

Q At which meeting?

A September 18th.

Document 97 of the Record at 33, Deposition of Gregory Sutliff.

Plaintiffs maintain that the record indicates that no outside director was advised or aware of any Goldman Sachs' evaluation of Meridian's potential beyond $45. Document 106 of the Record at 31 n. 12. This may imply that the Board was advised of Goldman Sachs' beliefs concerning Meridian's potential bid of forty-two (42) or forty-three (43) dollars a share. This issue, however, is unresolvable on this motion in light of the uncertainty concerning the Board's actual awareness.

Plaintiffs present evidence that Meridian would have increased its offer for Commonwealth had it been given the opportunity to do so. For example, a letter from Keefe, Bruyette & Woods, Inc., Meridian's investment banking firm, to Terry L. Troupe, Vice Chairman and Chief Financial Officer of Meridian, indicates that Meridian could go as high as forty-three (43) dollars a share in a cash/stock offering for Commonwealth. Document 27 of the Record, Tab 74; Document 107 of the Record, Tab N, Deposition of David Budd at 104. Defendants argue that McCullough felt that Commonwealth was not worth much more than $40, *see* Document 109 of the Record, Tab 12, but Meridian supposedly never had the opportunity to negotiate with Commonwealth so as to reach the maximum price Meridian would pay.

Concerning the Board's knowledge of Mellon's proposal, similar factual issues exist. Plaintiffs claim that the Mellon merger was approved at the October 8th meeting with undue haste. A review of the time sequence involving Mellon's offer reveals the following.

The Board was presented with pertinent legal and financial advice concerning Mellon's proposal for the first time at the October 8th meeting before voting.[25] *See* Document 27 of the Record, Tab 75, Commonwealth National Financial Corporation Special Board Meeting Minutes October 8, 1985. The meeting centered around aspects of the Mellon merger and pertinent documents were supplied to members of the Board. *See* Document 51 of the Record at 42–43. The dispatch with which the Board proceeded at the meeting may have resulted from prior knowledge and familiarity with Commonwealth's merger possibilities or from undue haste. In any event, the length of the deliberations, apparently less than two (2) hours, when construed in

---

**25.** As discussed in this Memorandum, Shuff concedes that when he notified the Board members at midnight on October 6th, of the October 8th meeting, he did not inform them that a Mellon proposal would be discussed at the meet-ing. *See supra* at 243–244. In fact, defendants present no evidence that any Board member, other than those involved in management, was aware of, much less familiar with, Mellon's offer prior to the October 8th Board meeting.

a light most favorable to plaintiffs, may support plaintiffs' position. That is, aside from the Board's general awareness of Commonwealth's merger potential, the availability and terms of Mellon's offer apparently were discussed only for two (2) hours.

Viewing the record in its entirety the court finds that factual issues exist concerning whether the individual board members failed to adequately inform themselves before acting on Mellon's merger proposal. Plaintiffs attempt to establish that the Board hastily approved the Mellon merger based on an incomplete picture of the potential bids for Commonwealth. Document 106 of the Record at 14. Specifically, plaintiffs state:

> (1) the Commonwealth board failed to read many of the 175 pages of financial analysis and legal documents but instead relied primarily on oral presentations of the legal and financial advisors and of management; (2) the Commonwealth directors failed to inquire about the range of fair value and what the highest and best price might be even though at least the executive committee members had been advised on September 26 that Goldman Sachs had valued the franchise at $42–$45 a share; (3) the Commonwealth directors did not inquire about what Commonwealth was worth or whether Meridian could pay cash even though they had already been told Meridian could make an all cash acquisition; (4) the fact that Richard Sapp told the Commonwealth directors that Meridian was still there should have led them to ask Meridian what its best price was; and (5) Goldman Sachs offered no opinion to the Commonwealth directors as to whether the lock-up was fair.

*Id.* at 16. Examining the facts in a light most favorable to plaintiffs, the court concludes that factual disputes exist concerning the Board's awareness of Goldman Sachs' financial evaluation of Commonwealth, Meridian's willingness and ability to offer a higher price and the terms, conditions and effect of Mellon's offer. The trier of fact may conclude that the Board failed to apprise themselves of material information, including pertinent evaluations by Goldman Sachs, before approving the Mellon merger.

Defendants assert that the Board reasonably relied on professional legal and investment advice. *See Hanson Trust PLC, HSCM v. ML SCM Acquisition, Inc., ML L.B.O., supra,* at 275–77. "It has been held that the presumption of good faith and sound judgment afforded by the business judgment rule is heightened where the majority of the board consists of independent, outside directors and where the directors have obtained and considered expert legal and business advice." *Enterra Corp. v. S.G.S. Assocs., supra,* at 685 (citations omitted); *see Panter v. Marshall Field & Co.,* 646 F.2d 271, 294 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). The first criterion is present in this case. The record indicates that fifteen (15) out of seventeen (17) directors were independent. *See, e.g.,* Document 99 of the Record at 21 and 38; Document 102 of the Record at 1 n. 1. It is obvious that the Board sought expert legal and investment advice. One of the questions, therefore, is whether the Board reasonably relied on this advice so as to insulate itself from liability in this case.

■ Initially, the court recognizes that this inquiry is interrelated with plaintiffs' assertion that the Board failed to *independently* inform themselves of material information. In *Hanson Trust PLC, HSCM v. ML SCM Acquisition, Inc., ML L.B.O., supra,* the court noted that directors may act improperly by deferring to management or financial advisors' advice. *Id.* at 276–77. In that case, the district court recognized that the Board failed to read or review carefully various offers and agreements and failed to inquire about the range of fair value. *Id.* at 276. Moreover, the court found unpersuasive the defense that the Board was familiar with the acquirees and hence was capable of making swift decisions. *Id.* As previously set forth, these types of cases must be decided upon the unique factual background presented, and material fact disputes exist in this case preventing the entry of summary judgment.

For example, the question of whether the Board was aware of certain critical opinions of Goldman Sachs has already been discussed. Did the Board know of Goldman Sachs' "kicking numbers" around in the $42 to $45 a share range? A reliance defense is appropriate only if the advice sought is relied on. Obviously, to be relied on, the advice or opinions must have been known to the Board. Furthermore, there is some question concerning the extent to which Goldman Sachs' and/or the legal advisors' opinions on the "ultimate" issues presented insulates the Board from potential liability. While this advice may be a factor, it is not dispositive. *Cf. Landy v. Amsterdam, supra* (under Pennsylvania law, reliance on an independent opinion is a defense to a charge of unfairness). That is, Goldman Sachs' opinion that forty (40) dollars was an attractive offer does not *per se* absolve the Board of liability when it is not clear that the Board was aware of the basis for Goldman Sachs' assertion.

Plaintiff's second major contention concerning the decision to merge with Mellon is that the Board failed to maximize price as required. The court previously discussed, in the April 7 Memorandum, the factual issue of whether it became clear to Commonwealth that it was going to have to merge with someone. *See* Document 51 of the Record at 40 (citing Deposition of Horace McCarty, Document 24 of the Record, Exhibit 7 at 1746). Plaintiffs aver that this conclusion was reached by the Board and that the Board was negligent in failing to get the maximum price once this decision was made. For purposes of this motion, the court finds that Commonwealth's Board may have been operating under the belief that Commonwealth was "up for sale."

Plaintiffs rely on Attorney Hagele's notes of a September 20, 1985 meeting with Merrill and McSpadden, Davis and Sapp, *et al.*, of Goldman Sachs, to support the finding that Merrill did not want to negotiate with a number of suitors to maximize price in an outright sale/bidding war. Document 86 of the Record at 8; Document 87 of the Record, Tab 29 at # 80026. These same notes may give credence to the claim that Merrill felt that negotiating only with Meridian was out of the question. Document 87 of the Record, Tab 29 at # 80026. Instead, Merrill believed that negotiating with a preferred white knight, especially PNC, was most desirable. *Id.* This may explain Merrill's position regarding Meridian. Initially, the court referred to Merrill's testimony that he considered negotiating with Meridian if Commonwealth was unsuccessful in "attracting a more attractive offer." *See supra* at 249–250. Moreover, Merrill was concerned about several aspects of Meridian's proposals and the possibility of a Mellon v. Meridian competition. As Merrill stated at his deposition:

There were a couple of things that really concerned me, one being the fact that they had just gone through two rather sizeable mergers with two relatively low performing banks. Central Pennsylvania in Philadelphia has just always been not a very good performing bank, and First of Allentown was just a terrible performing bank, and I just felt that it was from my perspective and having been involved with two problem banks over the last ten years I know how long it takes to turn around a problem bank, and the First of Allentown was really a sick dog, and I didn't see how—I just thought they had their plate full in terms of integrating those two banks. One merger had been in '83 and one merger had been in '84. I quite frankly, had a real question in my mind about the quality of the security at Meridian. I just thought it was too early to really see what the earning potential of that bank was, because you had First of Allentown that was not a good performance (sic), you had Central Penn who was not a good performer, and I know that as a result of mergers you can write down the loan portfolio, for instance, and then accrue that, write that back into earnings, and so it takes a couple of years to see really what the bank's earning ability was, and I had very serious questions about that. One.

Number two—But that's very important, because in my opinion, my opinion

only, I had serious questions about the value of Meridian's common stock.

Number two. From an employee standpoint, there was overlap. There was geographical overlap, which could mean significant personnel displacement.

Third. Meridian was a little bit larger bank than we were, but in terms of product development, they weren't much more sophisticated than we were, and I didn't see they brought much to our customers in terms of product support, enhanced products for our customers.

Those are basically the three reasons that I was somewhat skeptical about Meridian.

Document 36 of the Record, Tab 53 at 941b–942b. Merrill, however, does admit not discussing either of the last two (2) concerns with Meridian. *Id.* at 943b.

As stated, Merrill's desire not to maximize price in an outright sale/bidding war was stated during a meeting [26] between Merrill and his financial advisors. Document 106 of the Record at 29–30 n. 11. It is not clear whether this "desire" was made known to the entire Board. In any event, a centerpiece of plaintiffs' claim is that the directors failed to independently inform themselves. Presumably, plaintiffs maintain that had the Board investigated further, they would have realized that, pursuant to Merrill's wishes, price was not being maximized.

 Generally, when one fiduciary either approves, acquiesces in, or conceals a breach of duty by another fiduciary, both are jointly and severally liable. *Seaboard Indus., Inc. v. Monaco,* 442 Pa. 256, 276 A.2d 305 (1971); *Bellis v. Thal,* 373 F.Supp. 120 (E.D.Pa.1974), *aff'd mem.,* 510 F.2d 969 (3d Cir.1975). Defendants concede that:

> [I]f plaintiffs had overcome the presumption of the business judgment rule and shown that the decision of the entire Board was improper, then, as the cases

cited by this Court hold, individual directors could be jointly and severally liable if it had also been proven that they 'jointly participate[d] in the breach of fiduciary duty or approve[d] of, acquiesce[d] in, or conceal[ed] a breach by a fellow officer or director.'

Document 109 of the Record at 2–3. (citations omitted). Instead, defendants' position is that the decision of the Board as an entity is not subject to challenge. *Id.* at 3–4. Accordingly, Merrill's position, if found to be a breach of fiduciary duty, may be imputed to the entire Board if the fact finder concludes that each Board member approved of or acquiesced in the wrongdoing. *See* Document 108 of the Record, Tabs 1–15.

A more extended discussion concerning whether defendants failed to maximize price is appropriate. Goldman Sachs opined and Commonwealth's management expressed the belief that forty (40) dollars was a very attractive offer. Moreover, Goldman Sachs stated that Meridian would have serious dilution problems at forty-two (42) to forty-five (45) dollars a share. In other words, Meridian's ability to increase its bid was discounted because of the dilution problems inherent at these prices. *See* Document 97 of the Record at 2–3; Document 99 of the Record at 15.

A brief description of Meridian's dilution problems, as seen by Goldman Sachs, is necessary in order to evaluate the Board's acceptance of Mellon's proposal without attempting to "max-out" Meridian. Sapp of Goldman Sachs, in reacting to Meridian's offers of $38 to $39 a share, felt that based on the extensive analysis Goldman Sachs had run, it was not clear that Meridian had a "whole lot more" to pay for Commonwealth. Document 34 of the Record, Tab 11 at 269b–270b. Moreover, in response to a question concerning how high Goldman Sachs believed Meridian could go, Sapp stated:

---

**26.** In referring to this "meeting", plaintiffs aver that a conference call was utilized between Merrill and his financial advisors on September 20, 1985. Attorney Hagele states that Merrill was expressing his thought process. Document 109 of the Record, Tab 1 at 204. Hagele also attempts to explain Merrill's reasoning. *Id.* at 205, 207, 211–12. This "explanation", however, raises factual issues not resolvable in the present motion.

We felt based on our pro formas that Meridian was taking a large amount of dilution at the current level and the higher this went, the greater the dilution on their earnings per share and the greater potential falloff in the common stock of Meridian as a result of that dilution, and that we did not think he had $45 a share, we didn't think he had much more than $40 a share, if any. That was a judgment.

*Id.* at 270b–271b. Discussing specific dilution figures for Meridian, Goldman Sachs opined that in 1985 at $39 a share, Meridian was taking 10 percent dilution raising to 12 percent dilution at $42 a share. Document 37 of the Record, Tab 9 at 120A. As Sapp testified at his deposition, "[h]owever, we said 10 percent dilution for a bank is a substantial dilution, especially for a bank its size, especially given the earnings quality that it is purchasing for that, that there was a substantial risk that their stock could fall off." *Id.* at 120a–121a. The dilution impact on Meridian was expressly mentioned by at least one Board member as causing "concern." Document 34 of the Record, Tab 5—Deposition of Henry E.L. Luhrs at 125b–126b. The remainder of the Board apparently was made aware of this potential dilution problem as a result of the rather lengthy discussions concerning Meridian's proposals. *See supra* at 259–260. In fact, Sapp referred to the dilution situation involving Meridian and Mellon at the October 8th meeting. Document 109 of the Record, Tab 5 at 257–59. This information was contained in the analysis prepared by Goldman Sachs and given to the Board. *Id.* at Tab 14. At his deposition, Sapp averred that he presented the dilution figures to the Board orally in addition to the written report. Document 37 of the Record, Tab 9 at 117a–121a. The *effect* this information had on each Board member's decision must be determined by the trier of fact. For example, the court is uncertain whether each Board member read the financial analysis given to them by Goldman Sachs.

In comparison, Sapp recognized that Mellon was "dilution conscious." In referring to Mellon's dilution, Sapp stated "[a]nd that

$40 a share in this particular transaction structure—going from pro forma 1985, take 4 percent dilution, 1986 it went down to 3 percent dilution, 1986—if our boys make the projections which we discussed on Monday—they would be close to earning out on the dilution." Document 37 of the Record, Tab 9 at 117a–118a.

Plaintiffs maintain that these alleged dilution problems would be eliminated, or at least diminished, if the form of consideration was altered, *i.e.*, from stock-for-stock offering to cash or partial cash deal. Document 106 of the Record at 20 n. 5. According to plaintiffs, the issue of whether the form of consideration could be changed was not probed by the Board at the October 8th meeting. *Id.* Moreover, Shuff's notes taken at the September 18, 1985 Board meeting raise the possibility of Meridian coming forward with cash. Document 87 of the Record, Tab 21 at # 100351. In this regard, plaintiffs refer to a notation indicating that Goldman Sachs felt Meridian "could pay cash for acquisition." *Id.* Concededly, according to Commonwealth's outside counsel, Goldman Sachs' opinion was that Meridian was stretched out at $39 and there was little possibility of an all cash deal. Document 97 of the Record at 32. While an *all* cash deal may have been ruled out, it does not appear that the possibility of changing the consideration involved in Meridian's offer was extensively explored by the Board.

Defendants' argument that Meridian's last "firm" proposal was for thirty-nine (39) dollars a share, one (1) dollar less than Mellon's offer, does not mandate a finding that price was maximized. It may be that the trier of fact will find that Meridian would have offered an increased price itself or, notwithstanding Meridian's ability to actually pay more, Mellon would have increased price in an attempt to compete with Meridian.

The court is aware that the evidence of record would support a conclusion that the Board acted on Mellon's merger with the belief that Mellon might "walk away" should a bidding war ensue. Goldman Sachs and Commonwealth's management

expressed the opinion that Mellon would withdraw completely if Commonwealth did not accept its forty (40) dollar a share offer. *See* Document 31 of the Record at 43. That is, Mellon's offer, as perceived by Sutliff, a member of the Board, was by its condition one of "accept me or reject me, but don't try to play games with me." Document 97 of the Record at 29–30. Sapp based this assessment that Mellon may walk away on the great difficulty Mellon had in making the forty (40) dollar offer and the belief that Mellon would not go higher. Document 31 of the Record at 43; Document 34 of the Record, Tab 11 at 318b. Accordingly, the Board may have believed that it was faced with the real possibility of losing Mellon as a potential merger partner should they create a bidding war between Mellon and Meridian. The Board was informed by Goldman Sachs that a bidding war would not ensue because Mellon would not participate. Document 37 of the Record, Tab 9 at 122a.

■ Plaintiffs characterize defendants' position that Mellon would walk away as a "canned argument", apparently disputing its validity. Document 99 of the Record at 51. Furthermore, in a merger context, it is not unusual for potential suitors to drop out as price rises and competition increases. Again, this dispute is for the fact finder to decide.

This discussion does not imply that price per share is the only consideration. Conversely, other factors are important. For example, at least one Board member felt "[t]hat the dividend to the shareholders would be approximately double what the dividend would have been with Meridian." Document 34 of the Record, Tab 5—Deposition of Henry E.L. Luhrs at 132b.

Furthermore, by statute, the Board could consider so-called social issues in evaluating merger proposals.[27] Several Board members expressed their concern for the

employees of Commonwealth and the community during their depositions, believing that employee opportunity would be much greater with Mellon than it would be with Meridian. Document 34 of the Record, Tab 1—Deposition of William H. Alexander at 4b–5b; Tab 5—Deposition of Henry E.L. Luhrs at 128b; Tab 7—Deposition of Horace G. McCarty at 170b; Tab 9—Deposition of Charles F. Merrill at 202b. Again, while Mellon assured Commonwealth that it would negotiate social issues, Goldman Sachs, although believing Meridian could "[c]ertainly go into low 40's or higher within parameters of prior deals' dilution;" felt that Commonwealth would be risking social issues with Meridian. Document 86 of the Record at 10; Document 87 of the Record, Tab 30 at # 80039. The court has not been directed to pertinent testimony from individuals at Goldman Sachs supporting their belief that Commonwealth would risk social issues with Meridian. Goldman Sachs apparently believed that Meridian's position on the so-called social issues was not favorable so that the downside of this "low forties or higher" price was a sacrifice on social issues. In addition, Goldman Sachs opined that another risk inherent in Meridian's "low forties" price was that other white knights may have been driven away or unable to compete. *Id.*

■ The *Edelman, Revlon* and *Hanson Trust* line of cases may stand for the proposition that once a corporation is up for sale, directors are obligated to get the best price. Pennsylvania law, however, permits directors to consider factors other than price, *see* Marcotte, *supra,* and this factor apparently was not present in *Revlon* (applying Delaware law), *Hanson Trust* (applying New York law) or *Edelman* (applying Michigan law). *See also Baron v. Strawbridge & Clothier,* 646 F.Supp. 690, 697 (E.D.Pa.1986) (under Pennsylvania law,

---

27. In 1983, § 1408 was amended to add subparagraph (B) which provides:

In discharging the duties of their respective positions, the board of directors, committees of the board, individual directors and individual officers may, in considering the best interests of the corporation, consider the effects of

any action upon employees, suppliers and customers of the corporation, communities in which offices or other establishments of the corporation are located and all other pertinent factors.

15 Pa.Cons.Stat.Ann. § 1408(B) (Purdon Supp. 1986).

proper to consider effects of offer on employees, customers and community).

Defendants do not appear to quarrel with the contention that the Board realized that Commonwealth was going to have to merge with someone. The extent to which price could be sacrificed for these so called social issues in the factual context of this case is not a proper determination for the court. The record is replete with evidence upon which differing reasonable inferences may be drawn. The court may not resolve these disputes. Accordingly, summary judgment will not be granted on this issue.[28]

An appropriate Order will enter.

## ORDER

NOW, this 30th day of June, 1987, in accordance with the reasoning set forth in the accompanying Memorandum, IT IS HEREBY ORDERED THAT:

(1) Defendants' Motion for Summary Judgment is granted as to plaintiffs' § 14(a) claims pertaining to inadequacies in the proxy material other than the omission of the Meridian proposals.

(2) Defendants' Motion for Summary Judgment is denied as to plaintiffs' § 10(b) claims.

(3) Defendants' Motion for Summary Judgment is denied as to plaintiffs' § 14(a) claim pertaining to inadequacies in the proxy material concerning the omission of the Meridian proposals.

(4) Defendants' Motion for Summary Judgment is denied as to plaintiffs' state law claims.

---

**28.** Plaintiff's claim that the warrant or lock-up provision in the Mellon merger *per se* indicates a breach of the directors' fiduciary duty previously was rejected by the court. *See* Document 51 of the Record at 36–39. No new evidence has been presented by plaintiffs on this issue which creates material factual issues precluding summary judgment. Of course, the granting of the lock-up is intertwined with the decision approving the Mellon merger.